**2026-2113**

# United States Court of Appeals for the Federal Circuit

---

**WOLVERINE BARCODE IP LLC,**

*Plaintiff-Appellant,*

v.

**ALBERTSONS COS. INC.,**

*Defendant-Appellee.*

---

Appeal from the United States District Court for the Northern District of Texas in No. 3:25-cv-01448-B, Senior Judge Jane J. Boyle

---

## BRIEF FOR PLAINTIFF-APPELLANT WOLVERINE BARCODE IP LLC

William P. Ramey, III
RAMEY LLP
446 Heights Blvd., Suite 200
Houston, Texas 77007
(713) 426-3923
wramey@rameyfirm.com

***Counsel for Plaintiff-Appellant Wolverine Barcode IP***

**CLAIM 1 OF U.S. PATENT NO. 9,280,689**

1. A method for conducting offline electronic commerce transactions having a vendor barcode scanner and a vendor cash register comprising:

(a) providing a personal code to a person for their use to purchase goods;

(b) converting said personal code into barcode format to form a User ID Barcode, said User ID Barcode corresponding to said personal code and including at least one special character to distinguish the barcode as a User ID Barcode from a product barcode;

(c) storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor;

(d) establishing a User Account in a User Vendor Management Server corresponding to said personal code;

(e) depositing funds in said User Account to establish a credit limit;

(f) conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server;

(g) detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server;

(h) comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server;

(i) forwarding the approval signal to the vendor cash register; and

(j) repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode.

**CERTIFICATE OF INTEREST**

Counsel for Plaintiff-Appellant Wolverine Barcode IP LLC certifies the following pursuant to Federal Circuit Rules 26.1 and 47.4 (Form 9):

1. *Represented Entities.* The full name of every entity represented by undersigned counsel in this case: Wolverine Barcode IP LLC.

2. *Real Party in Interest.* The name of every real party in interest represented by undersigned counsel, if different from the entity above: None.

3. *Parent Corporations and Stockholders.* All parent corporations and any publicly held companies that own 10% or more of the stock of the represented entity: None.

4. *Legal Representatives.* The names of all law firms and the partners or associates that appeared for the represented entity in the trial court or are expected to appear in this Court and are not already listed on the docket: Ramey LLP: William P. Ramey, III and Kirby Blair Drake, not expected to appear.

5. *Related Cases.* See the Statement of Related Cases, *infra*, provided pursuant to Federal Circuit Rules 47.4(a)(5) and 47.5(b).

- Case No. 2:26-cv-00285 *Wolverine Barcode IP, LLC v. Subway IP LLC* In the Eastern District of Texas
- Case No. 2:26-cv-00153 *Wolverine Barcode IP, LLC v. Walgreen Co*. In the Eastern District of Texas
- Case No. 2:26-cv-00016 *Wolverine Barcode IP, LLC v. Chipotle Mexican Grill, Inc.* In the Eastern District of Texas

6. *Organizational Victims and Bankruptcy Cases*. None.

Date: October 1, 2026

/s/ William P. Ramey, III
William P. Ramey, III

# TABLE OF CONTENTS


JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES........................................................................1

STATEMENT OF THE CASE..........................................................................2

A. The ’689 Patent ........................................................................................2

B. Proceedings Below ....................................................................................4

SUMMARY OF ARGUMENT ........................................................................6

STANDARD OF REVIEW ..............................................................................9

ARGUMENT ...................................................................................................10

I. The District Court Erred at Alice Step One by Restating the Claims at a Level of Abstraction That Erased Their Claimed Architecture. ...................................10

A. The directed-to inquiry must be tethered to the claim language. ...............10

B. Claim 1 recites a specific means, not the idea of a store account. ..............11

C. The district court’s focus dropped every limitation that makes the claims concrete. ........................................................................................13

D. Western Express, Solutran, and Secured Mail do not support the judgment. .........................................................................................14

II. At a Minimum, the District Court Resolved Disputed Questions of Fact Against Wolverine at Alice Step Two, in Conflict with Berkheimer, Aatrix, and Cellspin. .........................................................................................16

A. Conventionality is a question of fact that cannot be resolved against the non-movant on the pleadings. .......................................................................16

B. The ’689 patent itself makes factual assertions about the 2010–2011 state of the art that placed conventionality in genuine dispute. .......................17

C. The court’s categorical refusal to consider the specification was legal error. 21

D. The claimed ordered combination is the kind this Court has repeatedly held can supply an inventive concept. .........................................................22

III. Dismissal with Prejudice Was an Abuse of Discretion. ............................26

IV. The Judgment Cannot Be Affirmed on the Infringement Grounds the District Court Declined to Reach. .........................................................................27

A. Remand, not first-instance affirmance, is the proper course. .................27

B. In any event, the complaint plausibly alleges that Albertsons performs or directs and controls every claimed step. ........................................................28

C. The indirect-infringement allegations likewise survive or, at minimum, warrant amendment. ........................................................................................30

CONCLUSION ..........................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) .................... 1, 2, 5, 7, 8, 16, 21, 26

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc).................... 09, 28, 29

*AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27 (Fed. Cir. 2024) .................... 9

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014)........ 01, 10, 16, 22, 25

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016) .................... 08, 24, 25

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) .................... 08, 23, 25

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) .. 1, 5, 7, 8, 9, 16, 20- 22, 26

*Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342 (Fed. Cir. 2021) .................... 09, 28

*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020) .................... 12

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019) .................... 1, 8, 16, 17, 20, 24, 25

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021) .................... 08, 10, 20

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) .................... 28

*Diamond v. Diehr*, 450 U.S. 175 (1981).................... 08, 22, 23, 25

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).................... 12

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256 (Fed. Cir. 2018)..... 09, 28

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016).................... 10

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ......... 06, 10, 14, 16

*Foman v. Davis*, 371 U.S. 178 (1962) .................... 09, 27

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002) .................... 09, 27

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323 (Fed. Cir. 2012).................... 30

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017) .................... 29

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009).................... 09, 16

*Lyda v. CBS Corp.*, 838 F.3d 1331 (Fed. Cir. 2016) .................... 29

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) .......... 10, 12
*Messaging Gateway Sols., LLC v. Amdocs, Inc.*, No. 14-732-RGA, 2015 WL 1744343 (D. Del. Apr. 15, 2015) .......... 13
*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011) .......... 16
*Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018) .......... 29
*Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698 (Fed. Cir. 2023) .......... 06, 8, 26
*Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017) .......... 14, 15
*Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161 (Fed. Cir. 2019) .......... 14, 15
*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311 (Fed. Cir. 2015) .......... 9
*W. Express Bancshares, LLC v. Green Dot Corp.*, 816 F. App'x 485 (Fed. Cir. 2020) (nonprecedential) .......... 14

**Statutes and Rules**

28 U.S.C. § 1295(a)(1) .......... 1
28 U.S.C. § 1331 .......... 1
28 U.S.C. § 1338(a) .......... 1
35 U.S.C. § 101 .......... 5, 6, 9, 10, 16, 20, 26, 28
Fed. R. App. P. 4(a)(1)(A) .......... 1
Fed. R. Civ. P. 12(b)(6) .......... 05, 9, 21
Fed. R. Civ. P. 15(a) .......... 09, 27

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), no other appeal in or from this civil action has previously been before this or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(b), counsel is aware of the following pending cases that may directly affect or be directly affected by this Court's decision because each asserts U.S. Patent No. 9,280,689:

- Case No. 2:26-cv-00285 *Wolverine Barcode IP, LLC v. Subway IP LLC* In the Eastern District of Texas
- Case No. 2:26-cv-00153 *Wolverine Barcode IP, LLC v. Walgreen Co*. In the Eastern District of Texas
- Case No. 2:26-cv-00016 *Wolverine Barcode IP, LLC v. Chipotle Mexican Grill, Inc.* In the Eastern District of Texas

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the patent laws of the United States. The district court entered a memorandum opinion and order granting Albertsons' motion to dismiss on July 9, 2026, Appx0002-Appx0021, and entered final judgment the same day, Appx0001. The judgment disposed of all claims of all parties. Wolverine filed its notice of appeal on July 27, 2026, Appx0326-Appx0327, within the thirty days allowed by Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred at *Alice* step one by restating claims 1–3 of U.S. Patent No. 9,280,689 as "setting up individual customer accounts and allowing those accounts to be used for purchases" — a formulation that omits every limitation making the claims concrete, including the claimed User ID Barcode marked with a special character so that the vendor's existing product scanner can distinguish user identification from product identification within a single scan stream.

2. Whether the district court erred at *Alice* step two by resolving the factual question of conventionality against the non-movant on the pleadings, contrary to *Berkheimer*, *Aatrix*, and *Cellspin*, and by refusing as a matter of law to consider specification-supported allegations of unconventionality.

3. Whether the district court abused its discretion by dismissing with prejudice and denying leave to amend as futile, where Wolverine had never amended its complaint and where amendment could supply the factual eligibility allegations that *Aatrix* holds sufficient to defeat dismissal.

4. Whether the judgment may be affirmed on the alternative infringement grounds the district court expressly declined to reach, where the complaint and its claim chart plausibly allege that Albertsons performs, or directs and controls, every step of the claimed method.

## STATEMENT OF THE CASE

### A. The ’689 Patent

U.S. Patent No. 9,280,689, entitled “Method and Apparatus for Conducting Offline Commerce Transactions,” issued on March 8, 2016 from an application claiming priority to a September 21, 2010 provisional. (Appx0028-Appx0034 ¶ 6, Appx0035-Appx0061). The patent addresses a problem the specification frames in concrete terms: as of the 2011 filing, customers paid for goods priced at micro-payment levels in cash because “the cost of the credit card transaction processing is too high,” making card processing impractical for such purchases for vendors and card networks alike. ’689 patent at 1:26–31; Appx0003.

The specification’s answer was not a new account type in the abstract. It “introduces a new method for identifying a user using the User ID Barcode,” ’689

patent at 2:34–35, built so that the vendor's existing point-of-sale equipment — the same barcode scanner and cash register already deployed at every checkout lane — could capture the user's identity in the same scan stream as the products being purchased. The claimed mechanism is specific. A personal code is converted "into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish the barcode as a User ID Barcode from a product barcode." (Appx0003, claim 1(b)). The purchase step requires "scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register," claim 1(f), so that a single scanner captures both data types and the vendor server can separate them by detecting the special character, claim 1(g). The server forwards the identifier and price to a User Vendor Management Server, which compares price against available funds and, if funds suffice, returns "an approval signal" that is "forward[ed] . . . to the vendor cash register." Claims 1(h)–(i); Appx0004. Step (j) repeats the purchase loop for subsequent transactions using the same barcode. Dependent claims 2 and 3 recite storage of the User ID Barcode on a cell phone or on a label secured to a credit card or cell phone.

The specification grounds this design in a series of factual assertions about the state of the art. It asserts that micro-payment purchases "are not made with credit cards because the cost of the credit card transaction processing is too high," '689 patent at 1:26–31, Appx0053; that RFID and NFC payment "require the user to load

the cell phone with money using a special machine available only at banks or limited places" while "[v]ery few vendors have a non-contact card reader," *id.* at ll. 32-43; that contactless stored-value cards such as SUICA and PASMO worked "only within Japan" at vendors with special readers, *id.* at ll. 53-60; and that, by contrast, "practically all store cash registers worldwide are equipped with barcode scanners," *id.* at 2:39-58, so that capture through the existing scanner "provides fast checkout and with limited cost to the vendor," whereas "[v]endors will be required to install RFID or NFC chip reader as new investments" under the alternatives, *id.* at 7:4–6, Appx0056. The specification also describes the advantages of the claimed architecture, including automatic registration "without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode," *id.* at 4:29–33, Appx0054; purchasing "without the need to provide each vendor the user's personal information," *id.* at 4:25–28; and improved "security for the user's personal sensitive information," *id.* at 5:66–67, Appx0055.

**B. Proceedings Below**

Wolverine sued Albertsons on June 6, 2025, alleging that the Albertsons Cash mobile-payment service infringes claims 1–3. (Appx0028-Appx0034 ¶¶ 6–12). The complaint attached a limitation-by-limitation claim chart mapping each step of claim 1 onto Albertsons' own public documentation. (Appx0062-Appx0083). The chart alleges, among other things, that when a customer opens the Albertsons app and

selects Albertsons Cash, "the system generates a one-time 3PL code"; that Albertsons Cash "converts that exact token into a barcode" prefixed with "3PL:" to signal that it is a User ID barcode rather than a product barcode; that Albertsons stores the token; that the checkout system scans and detects the barcode, compares the price against the customer's balance, and applies approved purchases to the account. (Appx0065-Appx0081).

Albertsons moved to dismiss under Rule 12(b)(6), arguing ineligibility under § 101 and, in the alternative, that the complaint fails to allege single-actor direct infringement or indirect infringement. (Appx0139-Appx0157). Wolverine opposed, invoking *Berkheimer* and *Aatrix*, identifying factual allegations and specification disclosures of unconventionality, and requesting leave to amend if the court found any pleading deficiency. (Appx0179-Appx0183).

The district court granted the motion. (Appx0002-Appx0021). At step one, the court rejected both parties' statements of the claims' focus — faulting Albertsons' "verifying a customer's ability to pay" framing because "it overgeneralizes and describes the claims at too high a level of abstraction," Appx0012 — and then adopted its own: the claims are "directed to the abstract idea of setting up individual customer accounts and allowing those accounts to be used for purchases." (Appx0011). At step two, the court held that the inventive features Wolverine identified could not be considered because they "come from the

specification, rather than the claims," and that "a specification cannot supply the inventive concept." (Appx0016). It found no arguably inventive concept in any element or in the ordered combination, Appx0017-Appx0018, dismissed with prejudice, and denied leave to amend as futile on the ground that "[n]o amendment to a complaint can alter what a patent itself states." (Appx0020) (quoting *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023)). The court expressly declined to reach Albertsons' infringement arguments, Appx0006, and entered final judgment. (Appx0001). This appeal followed. (Appx0326-Appx0327).

## SUMMARY OF ARGUMENT

The district court condemned claims that it never accurately described. The court warned, correctly, that a defendant's framing fails when it "overgeneralizes and describes the claims at too high a level of abstraction." (Appx0012). It then committed the same error. Its stated focus, "setting up individual customer accounts and allowing those accounts to be used for purchases," contains no barcode, no special character, no scanner, no server, and no approval signal. It is a description from which every claim limitation has been removed. *Enfish* holds that describing claims "at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." 822 F.3d at 1337. What the claims actually recite is a specific technical architecture: a user identifier converted into barcode format and marked with "at least one special

character" precisely so the vendor's existing *product* scanner can capture identity and merchandise in one scan stream and the vendor server can separate the two, followed by a defined round trip to a management server and an approval signal returned to the register. That is a particular means of solving a problem, card-processing costs that made micro-payments impractical, that arose in point-of-sale payment technology, and the solution is tethered to that technology. The claims survive step one.

At a minimum, the judgment cannot stand at step two. Whether a claim element or combination "is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," and any fact pertinent to invalidity "must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. Dismissal is proper "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix*, 882 F.3d at 1125. The '689 specification itself supplies those allegations: it asserts, as fact, that card networks had priced micro-payments out of electronic processing; that RFID and NFC required special loading machines and vendor-side readers "very few vendors" had; that contactless stored-value cards worked only in Japan and forfeited funds when lost; that the one device every vendor already owned was a product barcode scanner; and that the claimed special-character design, letting that existing scanner carry identity and merchandise in one separable stream, at "limited cost to

the vendor," did what no alternative did. Those are the same kind of specification-anchored improvements that created a factual dispute in *Berkheimer* itself, that carried the *CosmoKey* patentee past step two on the pleadings, and that required reversal in *Cellspin* and *Aatrix*. The district court refused to weigh them, holding categorically that "a specification cannot supply the inventive concept." Appx0016. That is legal error twice over: the features are captured in the claims, the special-character differentiation, the single-scanner capture, the server division of labor, the approval loop, and under *Diehr*, *BASCOM*, *Amdocs*, and *Cellspin*, an ordered combination of concededly known components is precisely where an inventive concept can reside. No evidence in this record shows the claimed arrangement was conventional in 2010–2011. The court cited none. It reasoned from generality, on a motion where every inference belonged to Wolverine.

The with-prejudice disposition compounds the error. Wolverine never amended. It asked for leave. *Aatrix* reversed a denial of leave to amend in precisely this posture, because a complaint can add factual allegations about the state of the art at the priority date, allegations outside the patent's four corners that *Sanderling*'s observation about the patent text does not reach. Denying Wolverine a single opportunity to plead those facts was an abuse of discretion.

Finally, the judgment cannot be affirmed on the infringement grounds the district court expressly declined to decide. Those questions belong to the district

court in the first instance. And they would fail in any event: the claim chart alleges that Albertsons' own system performs the generation, conversion, storage, detection, comparison, and approval steps, and that Albertsons conditions participation in Albertsons Cash on customer performance of the remaining steps while establishing their manner and timing, the attribution rule of *Akamai*, 797 F.3d at 1023. Under *Bot M8* and *Disc Disease*, those allegations state a plausible claim.

## STANDARD OF REVIEW

This Court applies regional-circuit law, here, the Fifth Circuit's, to the procedural question whether a complaint states a claim, and its own law to substantive issues of patent law. *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015); *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024). A Rule 12(b)(6) dismissal is reviewed de novo, accepting all well-pleaded facts as true and drawing all reasonable inferences in the plaintiff's favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Patent eligibility under § 101 is a question of law, based on underlying facts, reviewed de novo. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). Denial of leave to amend is reviewed for abuse of discretion, *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002), mindful that leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## ARGUMENT

### I. The District Court Erred at Alice Step One by Restating the Claims at a Level of Abstraction That Erased Their Claimed Architecture.

#### *A. The directed-to inquiry must be tethered to the claim language.*

Step one asks what the claims are "directed to" — their "focus" and "character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). The inquiry identifies "the focus of the claimed advance over the prior art," *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021), and it carries a discipline this Court has enforced repeatedly: the court "must be careful to avoid oversimplifying the claims," *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016), because "all inventions at some level embody, use, reflect, rest upon, or apply" abstract ideas, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (citation omitted). "[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). The operative question is "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." (Appx0009) (quoting *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017)).

***B. Claim 1 recites a specific means, not the idea of a store account.***

Read as this Court requires — in its entirety, limitation by limitation, in light of the specification — claim 1 recites a particular technical mechanism with three defining features, none of which appears in the district court's statement of the claims' focus.

*First*, the claim requires converting the personal code "into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish the barcode as a User ID Barcode from a product barcode." Claim 1(b). The special character is not decoration. It is the engineering choice that makes the rest of the claim possible: because user identification and product identification travel through the *same* scanner in the *same* scan stream, something in the data itself must tell the system which is which. The claim solves that problem in the encoding.

*Second*, the claim requires that each purchase include "scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register." Claim 1(f). The claim thus repurposes the vendor's existing point-of-sale hardware — one scanner, one register — to capture identity alongside merchandise, rather than requiring a card reader, a PIN pad, a signature-capture device, or any dedicated identification channel. The specification ties this design directly to the problem it solves: card-network processing costs made micro-payments impractical, '689 patent at 1:26–31 Appx0053, and capture "by the

cashier using the scanner available at the cash register" provides fast checkout "with limited cost to the vendor for the transaction processing." *Id.* at 7:1–3 Appx0056; Appx0140 (quoting same).

*Third*, the claim recites a defined data path with a defined division of labor: the vendor server — not the register, not the scanner — performs the "detecting" of the special-character-marked barcode and forwards identifier and price to the User Vendor Management Server, claim 1(g); the management server performs the funds comparison and issues the approval signal, claim 1(h); and the approval signal travels back through the vendor server to the register, claim 1(i), closing a loop the claim then requires to repeat, claim 1(j). This is an architecture. It specifies which component does what, in what order, with what data.

A claim with that content is "directed to a specific means or method," not to "an abstract end-result." This Court's cases resolving step one for the patentee involve exactly this posture: claims that recite a particular asserted technical improvement, read in light of a specification explaining the problem and the mechanism. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368–71 (Fed. Cir. 2020) (step one resolved for patentee where claims recited a specific device configuration for an asserted improvement); *McRO*, 837 F.3d at 1313–16 (specific claimed rules, not the general idea of automation); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–59 (Fed. Cir. 2014) (solution "necessarily

rooted" in the technology that created the problem). The persuasive reasoning of *Messaging Gateway* is on point as well: a claim is not abstract where the solution "is tethered to the technology that created the problem." 2015 WL 1744343, at 5. The problem here — payment-processing cost and friction at the physical point of sale — arose in POS technology, and the claimed solution operates through and upon that technology: its scanners, its registers, its servers, its data formats. (Appx0052-Appx0054).

### *C. The district court's focus dropped every limitation that makes the claims concrete.*

Against that claim language, place the district court's statement of the claims' focus: "setting up individual customer accounts and allowing those accounts to be used for purchases." (Appx0011). No barcode. No special character. No scanner. No scan stream. No server architecture. No approval signal. The formulation is not a summary of claim 1; it is what remains after claim 1 has been deleted. And the court reached it moments after rejecting Albertsons' own framing — "verifying a customer's ability to pay" — because "it overgeneralizes and describes the claims at too high a level of abstraction." (Appx0012). The court saw the error. It then repeated it at a marginally lower altitude.

The opinion's own walk through the claim confirms the mismatch. The court grouped steps (a) through (e) as "the setup" and steps (f) through (j) as using the

account, Appx0013-Appx0014, a grouping that treats "converting said personal code into barcode format" with a distinguishing special character as interchangeable with handing a customer a punch card. It is not. The special-character limitation answers a machine-level question — how does one scanner's data stream carry two different kinds of information without confusing them — that has no analogue in the "basic concept" of an account. When the character of a claim "as a whole" is at issue, a focus statement that accounts for none of the claim's distinguishing limitations cannot carry the analysis. *Enfish*, 822 F.3d at 1337.

### ***D. Western Express, Solutran, and Secured Mail do not support the judgment.***

The district court reasoned by analogy to three decisions. None fits, and the first should not have anchored the analysis at all.

*Western Express* is a nonprecedential disposition. 816 F. App'x 485 (Fed. Cir. 2020). It binds no one, and the claims there recited "the basic concept of a payment card" with a funds-transfer step — no scanner, no dual-purpose scan stream, no encoding mechanism distinguishing data types. (Appx0014) (describing *Western Express*). The district court acknowledged that the analogy required recasting the '689 claims so that "the 'payment card' is instead an individual account at a store." (Appx0014). An analogy that works only after the claims are rewritten is not an analogy; it is the over-abstraction *Enfish* forbids.

*Solutran* fails for the reason the district court itself recorded: the *Solutran* claims "did not improve the technical capture of information from a check" and did not "improve how a check is scanned." (Appx0015) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1167 (Fed. Cir. 2019)). The claimed advance there was *when* to credit an account — pure sequencing. The claimed advance here is *how* the capture itself works: a special-character-marked identifier designed so a product scanner can ingest identity and merchandise together and the system can tell them apart. That is precisely the scan-side technical content whose absence doomed the *Solutran* claims.

*Secured Mail* involved identifiers affixed to mail to "communicate information" about the mail object, where the claim language did "not explain how the sender generates the information." 873 F.3d 905, 911–12 (Fed. Cir. 2017); Appx0017-Appx0018. The *Secured Mail* claims solved no scanner-side differentiation problem; nothing in them concerned how one scanning system distinguishes categories of data in a single stream. Claim 1(b) does exactly that, and says how: "at least one special character to distinguish the barcode as a User ID Barcode from a product barcode." The distinction the *Secured Mail* panel found missing — claim language supplying the mechanism — is present here.

Because the district court's step-one holding rests on a focus statement untethered from the claims and on inapposite comparisons, it should be reversed.

The claims are directed to a specific asserted improvement in point-of-sale transaction technology, and the § 101 inquiry ends at step one. *Enfish*, 822 F.3d at 1339.

## II. At a Minimum, the District Court Resolved Disputed Questions of Fact Against Wolverine at Alice Step Two, in Conflict with Berkheimer, Aatrix, and Cellspin.

### *A. Conventionality is a question of fact that cannot be resolved against the non-movant on the pleadings.*

If the Court reaches step two, the governing rules are settled. "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368 (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)). Eligibility may be decided on the pleadings "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). The patent attached to the complaint is part of the pleading for this purpose, *id.*, so its factual statements about the state of the art stand on the same footing as any other well-pleaded allegation: they must be taken as true and read in the light most favorable to the patentee. *Lormand*, 565 F.3d at 257. And the analysis begins from the premise the district court itself recited: "patents granted by the Patent and Trademark Office are

presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019); Appx0005.

### *B. The '689 patent itself makes factual assertions about the 2010–2011 state of the art that placed conventionality in genuine dispute.*

This is not a case in which the patentee asked the district court to take unconventionality on faith. The '689 specification makes a series of concrete, testable factual assertions about what point-of-sale payment technology could and could not do at the priority date — assertions that describe the technological landscape, identify the specific shortcomings of every then-existing alternative, and explain what the claimed architecture changed. Each was before the district court. Each had to be credited. The specification asserts:

1. *Card networks had priced micro-payments out of electronic processing entirely.* Micro-payment purchases "are not made with credit cards because the cost of the credit card transaction processing is too high, making it impractical both for vendors and credit card companies to accept the use of a credit card for micro payment purchases." '689 patent at 1:26–31. (Appx0053).

2. *RFID and NFC payment required special-purpose infrastructure on both sides of the transaction.* Those methods "require the user to load the cell phone with money using a special machine available only at banks or limited places," a "non-contact card reader is required at the vendor site," and "[v]ery few vendors have a non-contact card reader. Therefore these payment methods are inconvenient for users."

*Id.* at ll. 32-43. that contactless stored-value cards such as SUICA and PASMO worked "only within Japan" at vendors with special readers, *id.* at ll. 53-60; and that, by contrast, "practically all store cash registers worldwide are equipped with barcode scanners," *id.* at 2:39-58, so that capture through the existing scanner "provides fast checkout and with limited cost to the vendor," whereas "[v]endors will be required to install RFID or NFC chip reader as new investments" under the alternatives, *id.* at 7:4–6 (Appx0056). The specification also describes the advantages of the claimed architecture, including automatic registration "without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode," *id.* at 4:29–33 (Appx0054).

3. *Contactless stored-value cards were geographically confined and lossy.* The SUICA, PASMO, Edy, and QUICPay cards "can be used only at vendors having the special non-contact card reader" and "only within Japan since the special non-contact card reader are rarely available outside of Japan," and if such a card "is lost, the remaining money in the card is lost." *id.* at ll. 53-60.

4. *The remaining alternatives imposed checkout friction.* "[U]sing a debit card often requires entering of a PIN, and/or the signature on a sales receipt," cash "require[s] the user to carry cash" and the cashier "to count the money and provide change," and "[b]oth payment methods take time and slow the completion of the purchasing transaction." *Id.* at 6:41-58 (Appx0055).

5. *The one piece of hardware every vendor already had was a product barcode scanner.* "[P]ractically all store cash registers worldwide are equipped with barcode scanners." *id.* at 2:39-58 (Appx0053).

6. *The special character is what makes a single scan stream separable.* Because the User ID Barcode is prefixed with a special character, "the system can distinguish the User ID Barcode from the product data barcode within the data captured by the barcode scanner." *Id.* at 3:15-30 (Appx0054).

7. *The claimed design eliminated new vendor investment; the alternatives demanded it.* Capture of the User ID Barcode "by the cashier using the scanner available at the cash register[] provides fast checkout and with limited cost to the vendor for the transaction processing," whereas "[v]endors will be required to install RFID or NFC chip reader as new investments if the system uses RFID or NFC technology." *id.* at 7:4–6 (Appx0056).

8. *The architecture protects the user's identity.* The design permits purchasing "without the need to provide each vendor the user's personal information," *id.* at 4:25–28, and permits automatic registration "without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode," *id.* at 4:29–33 (Appx0054), with improved "security for the user's personal sensitive information," *id.* at 5:66–67(Appx0055).

Taken as true, these assertions describe a 2010–2011 landscape in which no existing system carried user identification through the vendor's ordinary product-scan stream: every alternative demanded new hardware, special loading machines, geographic proximity to proprietary readers, or checkout friction, and the claimed combination — a special-character-marked identifier ingested by the scanner every vendor already owned, separated at the vendor server, and verified at a remote management server — did not exist. Whether that account of the art is accurate is quintessentially a question for evidence, not for a motion to dismiss.

This Court's decisions treat exactly this kind of intrinsic factual record as sufficient to defeat early § 101 disposition. In *Berkheimer*, the specification asserted that storing parsed data in "a purportedly unconventional manner" "eliminates redundancies," improves efficiency, and enables one-to-many editing; this Court held that "[t]he improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities," and vacated summary judgment as to the claims that captured them. 881 F.3d at 1369–70. In *CosmoKey*, the specification's own description of prior authentication methods and their shortcomings — and its statement that the claimed activation-timing steps departed from them — carried the patentee past step two on the pleadings. 15 F.4th at 1097–99. In *Cellspin*, plausible allegations that arranging concededly known devices in a

particular way — capturing data on one device, then publishing it through a separate, paired connection — was unconventional required reversal of a Rule 12(b)(6) dismissal. 927 F.3d at 1316–18. And in *Aatrix*, allegations that the claimed data-file structure improved on existing importation methods had to be accepted, making dismissal improper. 882 F.3d at 1127–28. The ’689 specification’s assertions are of the same character — more detailed than most, because they name the competing systems, identify their specific defects, and tie the claimed design to the elimination of each.

### *C. The court’s categorical refusal to consider the specification was legal error.*

Rather than confront that factual record, the district court ruled it out of bounds. The inventive features Wolverine identified, the court held, “come from the specification, rather than the claims,” and “a specification cannot supply the inventive concept.” Appx0016. *Berkheimer* forecloses that reasoning by its terms: the improvements in the specification, “to the extent they are captured in the claims,” create the factual dispute. 881 F.3d at 1369. The specification is not a forbidden source at step two; it is where the factual case for unconventionality lives. The only question *Berkheimer* directs a court to ask is whether the claims capture the asserted improvements.

These claims do. The separability improvement (assertion 6) is claim 1(b) — “at least one special character to distinguish the barcode as a User ID Barcode from

a product barcode" — and claim 1(g), which requires "detecting the User ID Barcode at the vendor server." The existing-scanner, no-new-hardware improvement (assertions 5 and 7) is claim 1(f) — scanning products and identifier alike "with a product barcode scanner at the vendor cash register." The privacy and registration improvements (assertion 8) are claims 1(c) through 1(e), which place the personal code with the user and in the management server rather than with any vendor. The friction improvements (assertions 1 and 4) flow from the combination of 1(f) through 1(i): one scan, one automated comparison, one approval signal — no PIN, no signature, no cash handling. This is the *Berkheimer* posture precisely: specification-asserted improvements, captured in claim limitations, disputed by no record evidence. In *Berkheimer* that combination required vacatur of summary judgment, on a full evidentiary record. It requires at least as much on the pleadings.

### *D. The claimed ordered combination is the kind this Court has repeatedly held can supply an inventive concept.*

The district court's alternative ground — that the ordered combination adds nothing because it is merely "a logical ordering" of steps that is "not an arguably inventive way of using known technology," Appx0018 — misunderstands what the ordered-combination inquiry protects. The Supreme Court has been explicit that "a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diamond v. Diehr*, 450 U.S. 175, 188 (1981); *see Alice*,

573 U.S. at 217–18 (reaffirming *Diehr*). Three of this Court's decisions show what that principle means in practice — and each maps onto the '689 architecture.

*BASCOM* is the location case. Every component there was admittedly generic — Internet-content filtering software, ISP servers, user accounts — and filtering itself was an abstract idea. The inventive concept lay in *where* the pieces were placed: a filtering tool installed at a specific, remote location on the ISP's server, associated with individual user accounts, which gave each user customized filtering without local software. 827 F.3d at 1350. "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* The '689 claims make the same kind of placement decisions, for the same kind of engineering reasons. Identity capture is placed *inside the product scan stream*, at the one device the specification says every vendor already owns (assertion 5) — not at a new card reader, not at a bank loading machine. Detection is placed *at the vendor server*, claim 1(g), so the register and scanner need no modification at all. Funds verification is placed *at a remote management server* holding the deposited balance, claim 1(h), so no vendor ever touches the user's personal information (assertion 8). As in *BASCOM*, the components are familiar; the architecture — which function sits where, and why — is the claimed advance, and it is what eliminates the new-hardware investment the specification says every rival approach required (assertion 7).

*Amdocs* is the distribution case. The claims there used generic network components — gatherers, information source modules, a central manager — but arranged them so that accounting data was enhanced in a distributed fashion, close to its source, rather than funneled to a central database; that distributed architecture was an unconventional technological solution to a technological problem, and it supplied the inventive concept even though each component, in isolation, was conventional. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300–02 (Fed. Cir. 2016). Claim 1 distributes its transaction pipeline the same way: the scanner captures both data types in one pass; the vendor server — not the register, and not the remote server — performs the sorting, detecting the special character and forwarding only the identifier and price, claim 1(g); the management server performs the comparison and issues the approval, claim 1(h); and the approval flows back down the same path to the register, claim 1(i). Work is positioned at the network node best suited to perform it, which is precisely the architectural judgment *Amdocs* credited.

*Cellspin* is the ordering case. Digital cameras, mobile phones, and short-range pairing were all known; the claimed advance was the sequence — capture data on one device first, establish a paired connection, then publish through the second device — and this Court held that plausible allegations that this ordering was unconventional defeated dismissal. 927 F.3d at 1316–18. The ’689 claims are order-

dependent in the same non-optional way. The special character must be embedded at *conversion*, claim 1(b), before any scan occurs — otherwise the single scan stream of claim 1(f) cannot be separated afterward. Detection at the vendor server, claim 1(g), must *precede* the forwarding of identifier and price, or the management server receives an undifferentiated stream. Comparison, claim 1(h), must precede the approval signal, and the approval must travel back through the vendor server to the register, claim 1(i), to complete the purchase the scan began. And step (j)'s repetition loop is what converts a one-time registration into a standing micro-payment capability — the answer to the specification's core economic problem (assertion 1). The district court called this "logical ordering," as if the sequence were happenstance. It is not happenstance; it is the design. Each step sits where it does because the single-scanner, dual-data-type architecture does not function otherwise.

Set against *Diehr*, *BASCOM*, *Amdocs*, and *Cellspin*, the district court's ordered-combination analysis reduces to the observation that barcodes, scanners, and servers were individually old. Appx0017-Appx0018. Wolverine never contended otherwise — no more than the *BASCOM* patentee claimed to have invented filtering software or the *Cellspin* patentee Bluetooth. Novelty of components has never been the test. *Alice*, 573 U.S. at 217. The test is whether the *combination, as ordered*, was well-understood, routine, and conventional in 2010–2011, and on that question the record contains nothing: no prior-art reference, no

admission, no judicially noticeable material — only the specification's contrary factual assertions, which were entitled to the truth. The court's conclusion that the arrangement was "not an arguably inventive way of using known technology," Appx0018, is a finding about the state of the art, made without evidence, on a motion to dismiss, against the party holding both the pleading-stage inferences and a presumption of validity. *Berkheimer* does not permit it.

### III. Dismissal with Prejudice Was an Abuse of Discretion.

Wolverine filed one complaint. It never amended. When Albertsons moved to dismiss, Wolverine asked for leave to amend to cure any deficiency the court identified. (Appx0182-Appx0183). The district court refused, holding amendment futile because "[n]o amendment to a complaint can alter what a patent itself states." (Appx0020) (quoting *Sanderling*, 65 F.4th at 706).

*Sanderling* answers a different question. It addresses amendments that would contradict or supplement the patent's own text. It says nothing about the category of amendment *Aatrix* holds can defeat a § 101 dismissal: factual allegations about the state of the art at the priority date — what skilled artisans knew, what prior point-of-sale systems could and could not do, why the claimed arrangement was not routine. Those facts live outside the patent's four corners. In *Aatrix*, this Court reversed the denial of leave to amend precisely because the proposed pleading contained such allegations, which had to be taken as true. 882 F.3d at 1125–28.

Wolverine's amendment would do the same work here: allege, with specificity, that no 2010–2011 point-of-sale system conventionally carried user identification through the product scan stream via a special-character-marked barcode; that contemporaneous alternatives required dedicated card readers, PIN entry, or signature capture; and that the claimed server division of labor and approval loop was not a routine arrangement — each a factual proposition subject to proof, none an alteration of the patent.

Under Fifth Circuit law, leave is to be freely given, and denial without a substantial reason — undue delay, bad faith, repeated failure to cure, undue prejudice, or genuine futility — is an abuse of discretion. *Great Plains Trust*, 313 F.3d at 329; Fed. R. Civ. P. 15(a); *Foman*, 371 U.S. at 182. None of those reasons exists on this record: the request came at the earliest possible juncture, on the first complaint, in a case with no scheduling prejudice. At minimum, the with-prejudice disposition should be vacated and the case remanded with instructions to permit amendment.

## IV. The Judgment Cannot Be Affirmed on the Infringement Grounds the District Court Declined to Reach.

### *A. Remand, not first-instance affirmance, is the proper course.*

Albertsons moved to dismiss on non-infringement and indirect-infringement grounds as well, but the district court expressly did not decide them, observing that a ruling on infringement after holding the patent invalid would constitute an advisory

opinion. (Appx0006). Those questions were never adjudicated. This Court is "a court of review, not of first view," *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005), and if the § 101 judgment falls, the ordinary and proper disposition is remand for the district court to address the remaining grounds in the first instance on a full record.

### B. *In any event, the complaint plausibly alleges that Albertsons performs or directs and controls every claimed step.*

Should the Court nonetheless consider the alternative grounds, they fail on the pleadings standard. A complaint states a claim for direct infringement when it contains factual allegations that, taken as true, "articulate why it is plausible that the accused product infringes the patent claim." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021); *see Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). Direct infringement of a method claim requires that all steps be "performed by or attributable to a single entity," and attribution exists "when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022–23 (Fed. Cir. 2015) (en banc). Whether that standard is satisfied is a question of fact. *Id.* at 1023.

The claim chart attributes the operative steps to Albertsons itself. Albertsons' "system generates a one-time 3PL code," Appx0065-Appx0066; "Albertsons Cash takes the internal authorization token . . . and converts it into a barcode" bearing the

"3PL:" prefix that distinguishes a User ID barcode from a product barcode, Appx0066-Appx0067; Albertsons "[c]ollects and retains that token," Appx0068-Appx0069; Albertsons establishes the linked user account, Appx0070-Appx0071; Albertsons' checkout system detects the barcode, captures the price, compares it against the customer's balance, and applies approved purchases, Appx0077-Appx0081. The steps in which a customer participates — scanning the code Albertsons generated at the register Albertsons operates, or loading funds through the app Albertsons designed — occur only within Albertsons Cash, a program Albertsons created, on terms Albertsons dictates: the chart quotes Albertsons' own terms providing that the app "will utilize the wireless capability of the mobile device . . . to communicate automatically with a Company point of purchase payment device, such as a cash register," whenever the device is in proximity and "scans the displayed QR Code." Appx0076. A customer cannot participate in Albertsons Cash at all except by performing those steps in the manner and at the time Albertsons' system prescribes. That is conditioning participation and establishing manner and timing — the *Akamai* rule — and at the pleading stage such attribution allegations suffice. *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018). *Lyda v. CBS Corp.*, 838 F.3d 1331 (Fed. Cir. 2016), on which Albertsons relied below, involved

a complaint that alleged no facts connecting the accused party to third-party conduct; the chart here does that work limitation by limitation.

### *C. The indirect-infringement allegations likewise survive or, at minimum, warrant amendment.*

Albertsons' attack on the indirect-infringement allegations rested first on the premise that no direct infringement was pleaded. (Appx0150). That premise fails for the reasons above: direct infringement is plausibly alleged with Albertsons as the single responsible actor, and in the alternative customers directly perform the method under Albertsons' instruction through an app that exists to walk them through each step. *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012). To whatever extent the district court on remand were to find the knowledge and intent allegations, Appx0028-Appx0034, insufficiently detailed, that is a defect of specificity curable by amendment — and a further reason the with-prejudice dismissal cannot stand.

## CONCLUSION

The judgment should be reversed and the case remanded for further proceedings. In the alternative, the judgment should be vacated and the case remanded, with instructions that Wolverine be granted leave to amend its complaint.

Respectfully submitted,

/s/ William P. Ramey, III
William P. Ramey, III

***Counsel for Wolverine Barcode IP LLC***

## **CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)**

The undersigned counsel of records for Appellants/Plaintiff, Wolverine Barcode IP LLC, certifies that this Principal Brief of Appellants/Plaintiff complies with the typeface requirement provided in Rule 32(a)(5) and type-volume limitation provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. In preparing this certificate, I relied on word-count program of Microsoft Office 365. This Brief contains 7,044 words.

Dated: October 1, 2026

/s/ William P. Ramey, III
William P. Ramey, III

## **CERTIFICATE OF SERVICE**

I certify that I served a copy on counsel of record on October 1, 2026, via email by ECF filing.

/s/ William P. Ramey, III
William P. Ramey, III

# ADDENDUM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WOLVERINE BARCODE IP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-1448-B |
| | § | |
| ALBERTSONS COMPANIES, INC., | § | |
| | § | |
| Defendant. | § | |

FINAL JUDGMENT

On July 9, 2026, this Court **GRANTED** Defendant Albertsons Companies, Inc.'s Motion to Dismiss (Doc. 24) and **DISMISSED WITH PREJUDICE** Plaintiff Wolverine Barcode IP LLC ("Wolverine")'s action after finding U.S. Patent No. 9,280,689 ineligible for patent protection under 35 U.S.C. § 101. It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that Wolverine takes nothing. This is a **FINAL ORDER AND JUDGMENT** that disposes of all parties and all claims and controversies in the above-captioned case.

**SO ORDERED.**

**SIGNED: July 9, 2026.**

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WOLVERINE BARCODE IP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-1448-B |
| | § | |
| ALBERTSONS COMPANIES, INC., | § | |
| | § | |
| Defendant. | § | |

# MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Albertsons Companies, Inc. ("Albertsons")'s Motion to Dismiss (Doc. 24) made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiff Wolverine Barcode IP LLC ("Wolverine") has filed a response (Doc. 29), and Albertsons has filed a reply (Doc. 30). For the reasons that follow, the Motion is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**.

## I.

## BACKGROUND

Wolverine owns U.S. Patent No. 9,280,689, which is titled "Method and Apparatus for Conducting Offline Commerce Transactions." *See* Doc. 1, Compl. ¶ 6; '689 Patent, Title. Albertsons operates grocery stores where customers can pay through their mobile devices using personal "Albertsons Cash" accounts. *See generally* Doc. 1-2, Compl. Ex. 2. In this lawsuit, Wolverine has accused Albertsons of directly and indirectly infringing the '689 Patent through the Albertsons Cash service. *See* Doc. 1, Compl. ¶¶ 8–12.

The ’689 Patent “relates to novel and improved methods and apparatuses for conducting offline transactions that use a barcode as a method of personal identification.” *Id.* ¶ 7. When the ’689 Patent was filed in 2011, customers would “pay for goods priced in micro payment levels, such as five cents or ten cents[,] using cash.” ’689 Patent at 1:26–27. Although credit cards were used for larger transactions, they were impractical for such small amounts because the transaction fee was too high relative to the purchase amount. *See id.* at 1:27–31. The ’689 Patent “introduce[d] a new method for identifying a user [i.e., customer] using the User ID Barcode, allowing the user to charge purchasing of goods priced in micro payment level or non-micro payment level either offline or online at a participating vendor site.” *Id.* at 2:34–38.

The ’689 Patent has three “claims,” or distinct inventions, that it covers. *See id.* at 17:30 to 18:34. Claim 1 is independent, and Claims 2 and 3 depend upon the claimed method in Claim 1. *See id.* Claim 1 reads:[1]

> 1. A method for conducting offline electronic commerce transactions having a vendor barcode scanner and a vendor cash register comprising:
>
> (a) providing a personal code to a person for their use to purchase goods;
>
> (b) converting said personal code into barcode format to form a User ID Barcode, said User ID Barcode corresponding to said personal code and including at least one special character to distinguish the barcode as a User ID Barcode from a product barcode;
>
> (c) storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor;
>
> (d) establishing a User Account in a User Vendor Management Server corresponding to said personal code;
>
> (e) depositing funds in said User Account to establish a credit limit;

[1] Mark this point in the opinion for easy future reference because the letter-labeled steps will come up again in the Analysis section.

> (f) conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server;
>
> (g) detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server;
>
> (h) comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server;
>
> (i) forwarding the approval signal to the vendor cash register; and
>
> (j)[2] repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode.

*Id.* at 17:31 to 18:29. Claim 2 adds: "The method of claim 1 wherein said User ID Barcode is stored by said person in a cell phone." *Id.* at 18:30–31. Claim 3 adds: "The method of claim 1 wherein said User ID Barcode is stored by said person on a label secured to a credit card or secured to a user's cell phone." *Id.* at 18:32–34.

Wolverine attached to its Complaint a chart with Claim 1's language, annotated depictions of how the Albertsons Cash system works, and some added description of how Albertsons allegedly infringes Claim 1. *See generally* Doc. 1-2, Compl. Ex. 2.

Albertsons moved to dismiss the Complaint on grounds that the '689 Patent is ineligible for patent protection and that Wolverine failed to plausibly allege infringement. *See generally* Doc. 24, Mot. Dismiss. The Court considers the motion to dismiss below.

[2] The '689 Patent erroneously labels this step with the letter "i." To avoid confusion, "j" is used here and throughout the Analysis section below to refer to Claim 1's ultimate step.

## II.

## LEGAL STANDARD

Fifth Circuit law governs the procedural question of whether Wolverine stated a plausible patent infringement claim. *See Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018) (citation omitted). The standard should be familiar: Rule 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering whether the plaintiff has stated a claim, courts must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).

Within this familiar inquiry, Federal Circuit law applies to all "substantive issues of patent law." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (citation omitted). That includes the two grounds for Rule 12(b)(6) dismissal asserted here: patent ineligibility and non-infringement.

For patent ineligibility, all "patents granted by the Patent and Trademark Office are presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011)). Nevertheless, a defendant can attempt to overcome the "presumption of validity" by "prov[ing] that the patent never should have issued in the first place." *Id.* (internal quotation mark omitted) (quoting *Microsoft*, 564 U.S. at 96–97). Patent

"[e]ligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citations omitted). "Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *Id.* (collecting cases).

The other asserted ground for dismissal—non-infringement—also requires reference to Federal Circuit law. *See AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024) (citation omitted) ("We apply our own law to the specific question of whether a complaint states a claim of patent infringement on which relief may be granted."). "[A]n adequate complaint need only contain 'some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Id.* (citation omitted). But if a court determines that a patent is invalid due to ineligibility, the court should not make a determination on infringement because it would "constitute[] an impermissible advisory opinion." *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring) (citing *Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)).

**III.**

**ANALYSIS**

The '689 Patent claims a patent-ineligible abstract idea and is therefore invalid. To explain why, the Court first summarizes relevant portions of the legal framework for assessing patent eligibility. Next, the Court analyzes the '689 Patent according to that framework. Finally, the Court addresses why leave to amend would be futile.

A. *Assessing Patent Eligibility Involves a Two-Step Analysis.*

"Section 101 of the Patent Act defines the subject matter eligible for patent protection." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). Section 101 has four categories of patentable subject matter: "any new and useful [1] process, [2] machine, [3] manufacture, or [4] composition of matter." A patent may also be issued for "any new and useful improvement" in one of those four categories. § 101. "Other than as so limited, the patent system is described as available to 'anything under the sun that is made by man.'" *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).

But § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted). Those three patent-ineligible concepts are "the basic tools of scientific and technological work." *Id.* (citation omitted). To grant someone the exclusive right to a law of nature, natural phenomenon, or abstract idea would lead to "monopolization" that "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (citation modified); *see* U.S. Const., art. I, § 8, cl. 8 ("The Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts . . . ."). Monopolization of these patent-ineligible concepts would be harmful because, as "the building blocks of human ingenuity," the concepts are *in* every patentable invention. *See Alice*, 573 U.S. at 217 (citation omitted).

Marking the line between patent-ineligible abstract ideas and patent-eligible processes invented using those ideas has proven to be a challenging task for courts. *See Internet Pats.*, 790 F.3d at 1345. Because many patents are "drafting effort[s] designed to monopolize" abstract ideas, *see Alice*, 573 U.S. at 221 (citation omitted), courts conducting an eligibility analysis under § 101 must

be careful not to be "deceived by the 'draftsman's art.'" *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 226). To help lower courts conduct the analysis, the Supreme Court in *Alice* established a two-step analytical framework. *See* 573 U.S. at 217–18.

1. *Alice* Step One

Step one is to "determine whether the claims at issue are directed to one of [the] patent-ineligible concepts," such as abstract ideas. *Id.* at 217 (citation omitted). What the patent claims are "directed to" involves "looking at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations and internal quotation marks omitted). More concretely, the inquiry requires identifying "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). When identifying the claims' "focus," a court must be careful not to generalize too broadly because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Solutran*, 931 F.3d at 1168 (quoting *Mayo Collab. Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)).

To identify the "focus," a patent's specification may be helpful, but its claim language is paramount. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). The specification is "useful in understanding 'the problem facing the inventor' as well as what the patent describes as the invention." *Id.* at 767. "But while the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to

the claim language in identifying that focus." *Id.* at 766. A court therefore does not err in identifying a "focus" of the claims that is "directly tethered to the claim language." *Solutran*, 931 F.3d at 1168.

Once a court has identified the claims' "focus," a court must determine whether that "focus" is a patent-ineligible concept. "The inquiry often is whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). "Limiting the invention to a technological environment does 'not make an abstract concept any less abstract under step one.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017)). Neither does "[a]dding one abstract idea . . . to another abstract idea . . . render the claim non-abstract." *RecogniCorp*, 855 F.3d at 1327.

At step one, the Federal Circuit and Supreme Court "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. As relevant to this case, "fundamental economic practice[s]" are patent-ineligible abstract ideas, "even where the financial transaction claimed includes physical components." *See W. Express Bancshares, LLC v. Green Dot Corp.*, 816 F. App'x 485, 486 (Fed. Cir. 2020) (citations omitted) (collecting Supreme Court and Federal Circuit cases). If "the innovative aspect of the claimed invention [is] an entrepreneurial rather than a technological one," the claim is not eligible for patent protection. *See Solutran*, 931 F.3d at 1166 (quoting *Ultramercial*, 772 F.3d at 722 (Mayer, J., concurring)).

2. *Alice* Step Two[3]

Step two—which should be reached only if a court determines at step one that the patent's claims are directed to an abstract idea—prompts the court to ask, "[w]hat else is there in the claims before us?" *Alice*, 573 U.S. at 217 (citation omitted). "To answer that question, [a court] consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 79, 78). Step two is the "search for an 'inventive concept.'" *Id.* at 217 (citation omitted). "An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (citing *Alice*, 573 U.S. at 222–23).

A patent is ineligible for protection when the patent's claims entirely lack concepts that could be considered inventive. *See, e.g.*, *Two-Way Media, Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338–39 (Fed. Cir. 2017). When a patent is directed to an abstract end-result, "[i]nquiry . . . must turn to any requirements for *how* the desired result is achieved." *Id.* at 1339 (quoting *Elec. Power Grp.*, 830 F.3d at 1355). Mere "invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." *Elec. Power Grp.*, 830 F.3d at 1355 (citations omitted).

[3] If parts of step two's framework sound the same as step one, that is somewhat by design. "[T]he two stages involve overlapping scrutiny of the content of the claims," and "there can be close questions about when the inquiry should proceed from the first stage to the second." *Elec. Power Grp.*, 830 F.3d at 1353 (citations omitted). Think of step two as a "lifeline" providing for more rigorous scrutiny after a patent fails step one. *See CosmoKey*, 15 F.4th at 1100 (Reyna, J., concurring).

At the motion-to-dismiss stage, a court should "search for an inventive concept in precisely the factors that [the plaintiff] argues comprises the inventive concept." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017). If "the alleged 'inventive concept' that solves problems identified in the field . . . is the abstract idea itself," the claim does not survive step two. *See ChargePoint*, 920 F.3d at 774.

*B. The '689 Patent is Ineligible for Patent Protection.*

Assessing the '689 Patent's claims at *Alice* step one, the Court determines that they are directed to the abstract idea of setting up individual customer accounts and allowing those accounts to be used for purchases. At step two, the Court concludes that the '689 Patent is ineligible for patent protection because it contains no inventive concept to transform the patent-ineligible abstract idea into a patent-eligible application of the idea.

1. At *Alice* Step One, the '689 Patent is Directed to the Abstract Idea of Setting Up Individual Customer Accounts and Allowing Those Accounts to be Used for Purchases.

The parties offer competing statements of the '689 Patent's "focus." Pulling from the '689 Patent's Abstract, Wolverine contends that the focus is "Methods and apparatus for conducting offline commerce transactions that use a barcode as an alternative means for personal identification." Doc. 29, Resp., 4 (quoting '689 Patent, Abstract). Albertsons asserts that the focus is "nothing more than verifying a customer's ability to pay." Doc. 24, Mot., 6.

Neither party's statement of the focus adequately captures the claims' "character as a whole." *See Elec. Power Grp.*, 830 F.3d at 1353 (citation omitted). To start, Wolverine's proffered focus comes only from the '689 Patent's Abstract and is altogether "untethered from the language of the claims." *See Enfish*, 822 F.3d at 1337 (citations omitted). Although Wolverine is correct that the '689 Patent's specification and Abstract may be consulted to illuminate the claims' focus, *see* Doc. 29, Resp., 4 &

n.20, "reliance on the specification must *always* yield to the claim language in identifying that focus." *ChargePoint*, 920 F.3d at 766 (emphasis added). The Court therefore rejects Wolverine's proffered focus.

Albertsons's proffered focus—"verifying a customer's ability to pay"—is also presented primarily through specification language, *see* Doc. 24, Mot., 5–6, but it fails because it overgeneralizes and describes the claims at too high a level of abstraction. *See Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." (citations omitted)). True, as discussed later in this subsection, "verifying a customer's ability to pay" is *an* abstract idea that is represented in the '689 Patent. But "the claims are not simply directed to *any* form of" verifying ability to pay, but "instead are specifically directed to" an idea on how to conduct transactions (which involves verifying ability to pay). *See id.* To Albertsons's credit, it gets much closer to identifying the proper focus when it says: "The claims, taken as a whole, require scanning a barcode, checking a server to see whether the customer has enough money, and then telling the register whether or not the customer has enough money." Doc. 30, Reply, 2.

Looking first to the specification to "illuminate" the claims' focus, "the problem facing the inventor" was finding a means to pay that does not use cash or a credit card. *See ChargePoint*, 920 F.3d at 766–67. Prior to the '689 Patent's issuance, small payments that were not worth the credit card transaction fee were made using cash. *See* '689 Patent at 1:26–31. To enable customers to pay without cash or a credit card, the '689 Patent "introduce[d] a new method for identifying a user using the User ID Barcode, allowing the user to charge purchasing of goods priced [at any level] either online or offline at a participating vendor site." *Id.* at 2:34–38. That newly introduced method

is "what the patent describes as the invention," *see ChargePoint*, 920 F.3d at 767, and is acknowledged by both parties. *Compare* Doc. 24, Mot., 5 (citing '689 Patent at 2:34–36), *with* Doc. 29, Resp., 5 & n.22 (citing '689 Patent at 2:34–38).

Guided by the specification's illumination, the Court determines that the '689 Patent's claims are directed to a process for setting up individual user accounts and allowing those accounts to be used for purchases. In Claim 1, steps (a) through (e) are the setup. Step (a) recites "providing a personal code to a person for their use to purchase goods." In step (b), the personal code is "convert[ed] into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish" it from product barcodes. In step (c), both the customer and the vendor store the User ID Barcode: the customer (according to Claims 2 and 3) might store it on her cellphone or on a label affixed to her credit card or cellphone, and the vendor stores it in a "User Vendor Management Server." On the vendor's management server, the vendor then establishes a "User Account" for the particular user in step (d). In step (e), someone "deposit[s] funds in said User Account to establish a credit limit."

After steps (a) through (e), the individual accounts are ready to be used for repeated purchases. In step (f), the user "conduct[s] purchases at vendors" by scanning both product barcodes and the User ID Barcode. In step (g), the User ID Barcode is "detect[ed] and "forward[ed]," along with the purchase price, to the vendor's management server. In step (h), the vendor's management server "compar[es]" the price to the funds available in the user's account and, if the funds are sufficient, "send[s] an approval signal" back.[4] In step (i), the approval signal is "forward[ed] . . . to

[4] Step (h) is the "verifying a customer's ability to pay" that Albertsons had identified as the focus.

the vendor cash register." Finally, step (j) says to "repeat[] steps (f) through (i) for subsequent purchase transactions using [the same] User ID Barcode."

The claims' focus of setting up and using individual accounts for purchases is a "fundamental economic practice," *see W. Express*, 816 F. App'x at 486, similar to those that the Supreme Court and Federal Circuit have "already found to be directed to an abstract idea." *See Enfish*, 822 F.3d at 1334 (explaining that determining abstractness at *Alice* step one may be sufficiently done by comparison to previous cases). For example, in *Western Express*, the patent at issue described "the basic concept of a payment card." 816 F. App'x at 486.[5] The Federal Circuit held that the patent contained nothing beyond a 'fundamental economic practice long prevalent in our system of commerce.'" *Id.* at 487 (quoting *Alice*, 573 U.S. at 219). In so holding, the Federal Circuit rejected the plaintiff's arguments that its patent "solve[d] several problems associated with prior art money account cards," including "creating a bank account without an approval process" and "allowing the immediate purchase of goods." *Id.* Those purported "advantages" were "just the conventional benefits of a payment card." *Id.*

Here, like the "basic concept of a payment card" in *Western Express*, the '689 Patent's focus of setting up and using individual accounts for purchases is an abstract idea. Setting up the accounts in steps (a) through (e) is akin to the "basic concept of a payment card"—here, the "payment card" is instead an individual account at a store. Using the account for purchases in steps (f) through (j) builds on the same basic concept: once you have the individual account (or payment card), then you use it to make purchases. Nothing in the '689 Patent's focus goes beyond "the conventional benefits"

[5] The patent in *Western Express* also contained a funds-transfer step that is not relevant here.

of having an individual account for purchasing items at a store. *See id.* Thus, the focus of the '689 Patent is directed to an abstract idea.

Even without the direct analogy to *Western Express*, the Court could reach the same conclusion because the "innovative aspect of the claimed invention" is "entrepreneurial," not "technological." *See Solutran*, 931 F.3d at 1166 (citation omitted). In *Solutran*, the patent at issue involved "a system and method of electronically processing paper checks" that merely "recite[d] basic steps of electronic check processing." *Id.* at 1163, 1166. The patent's alleged innovation was in the ordering of the patent's steps, which taught crediting a merchant's account before scanning the check. *See id.* at 1167. Analogizing to previous Supreme Court case law, the Federal Circuit held that crediting the merchant's account earlier rather than later was an abstract idea. *See id.* (analogizing to *Bilski v. Kappos*, 561 U.S. 593 (2010), and *Alice*). The Federal Circuit rejected the notion that "the claims '[were] directed to a specific improvement to the way computers operate' and therefore not directed to an abstract idea." *Id.* (quoting *Enfish*, 822 F.3d at 1327). The claims "did not improve the technical capture of information from a check to create a digital file or the technical step of electronically crediting a bank account"; did not "improve how a check is scanned"; and were not "'limited to rules with specific characteristics' to create a technical effect." *Id.* (citations omitted). Involving no arguable technological improvement and reflecting only "[t]he desire to credit a merchant's account as soon as possible," the patent in *Solutran* was directed to a patent-ineligible abstract idea. *See id.*

Like the idea to credit a merchant's account sooner in *Solutran*, the idea to set up and use individual accounts here is entrepreneurial, not technological. It reflects a solution to the business issue of how a store's customers can pay for goods, not some purported improvement to the

technology used for payment. The nontechnological nature of the ’689 Patent will become more apparent from the step-two analysis below, but for the purposes of *Alice* step one, the ’689 Patent’s focus is merely entrepreneurial. The ’689 Patent is therefore directed to an abstract idea and fails *Alice* step one.

2. At *Alice* Step Two, the ’689 Patent Contains No Inventive Concept to Transform the Claims Into Patentable Subject Matter.

To avoid dismissal at *Alice* step two, Wolverine raises two assertedly inventive features. First, Wolverine argues that the ’689 Patent contains “the provision of enabling ‘the user to automatically register with the [vendor’s management server] without requiring the user to enter details of personal information upon the user’s first use of the User ID Barcode for purchasing goods.’” Doc. 29, Resp., 8 (quoting ’689 Patent at 4:29–33). Second, Wolverine argues that “security for the user’s personal sensitive information is improved” through the ’689 Patent’s method. *Id.* (quoting ’689 Patent at 5:66–67).

Neither of these assertedly inventive features save the ’689 Patent. For starters, both features come from the specification, rather than the claims. “To save a patent at step two, an inventive concept must be evident in the claims.” *RecogniCorp*, 855 F.3d at 1327 (first citing *Alice*, 573 U.S. 221; and then citing *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016)). A specification might shed light on why a concept from the claims is arguably inventive, but a specification cannot supply the inventive concept. Even if it could, the two assertedly inventive features raised by Wolverine do not “explain *how* the desired result is achieved” through some technological improvement. *See Elec. Power Grp.*, 830 F.3d at 1355. The ’689 Patent does not teach *how* a user can automatically register with the vendor’s management server on first use of her barcode. And the idea that the user does not need to provide personal information for her barcode

is not a technological improvement but just the abstract idea that the code used to individualize accounts can be based on non-personal information.

Even examining the '689 Patent's claims beyond what Wolverine has raised, no other technological concept recited therein—such as barcodes, scanners, or servers—is arguably inventive. A pertinent comparison is *Secured Mail Solutions*, where the Federal Circuit assessed seven patents that all "involve[d] methods whereby a sender affixes an identifier on the outer surface of a mail object (e.g. envelope or package) before the mail object is sent." 873 F.3d at 907. For all seven patents, "[c]omputers and networks are used to communicate the information about the mail object's contents and its sender after the mail object is delivered." *Id.* The Federal Circuit labeled one group of patents that "recite[d] a method for verifying the authenticity of the mail object" as "the Intelligent Mail Barcode patents." *Id.* In that group of patents, the "identifier" or "barcode" affixed to the mail object was "a single set of encoded data that is generated by concatenating a sender-assigned unique identifier with sender data, recipient data, and shipping method data." *Id.* That identifying barcode would also be stored in a database, which the recipient of the mail object could access to verify that the mail object she received was authentic. *Id.*

Having found that all seven patents' claims in *Secured Mail Solutions* "embrace[d] the abstract idea of using a marking affixed to the outside of a mail object to communicate information about the mail object," the Federal Circuit turned to *Alice* step two. *See id.* at 911. For the Intelligent Mail Barcode patents, the Federal Circuit assessed the elements of generating the identifier by "combining various pieces of data" and observed:

> The data need not even be in the form of a barcode, much less a specific new type of barcode. The claim language does not explain how the sender generates the information, only that the information itself is unique or new. The claim language

> does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it.

*Id.* at 911–12. With no arguably inventive concept to save the claims, the Federal Circuit affirmed the district court's decision to dismiss on a Rule 12(b)(6) motion. *See id.* at 912–13.

Here, as with the Intelligent Mail Barcode patents in *Secured Mail Solutions*, the '689 Patent's claims "do[] not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it." *See id.* at 912. The '689 Patent does limit itself to a barcode but not to "a specific new type of barcode." *See id.* at 911. The '689 Patent also does not explain the technical steps necessary to generate the barcode, scan it, process it, or communicate approval of the purchase. *See id.* at 911–12. And neither the '689 Patent's specification nor Wolverine's briefing asserts that the technology of barcodes, scanners, or servers were invented by the '689 Patent. Thus, although the '689 Patent invokes the use of technology, it does not contain an arguably inventive concept sufficient to save the claims at *Alice* step two. *See Elec. Power Grp.*, 830 F.3d at 1355 ("We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." (citations omitted)).

Zooming out to the ordered combination of the claim elements, the '689 Patent still lacks an arguably inventive concept. *See Alice*, 573 U.S. at 217 (prescribing consideration of claims "as an ordered combination" at step two (citation omitted)). An inventive concept can exist "in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. But the logical ordering of first setting up individual customer accounts and then allowing their use for purchases is not an arguably inventive way of using known technology, and Wolverine makes no argument to the contrary.

Finally, Wolverine argues that the ’689 Patent solves “a specific problem arising in electronic commerce.” Doc. 29, Resp., 8–10. In support, Wolverine attempts to analogize to *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, Nos. 14-732-RGA–14-737-RGA, 2015 WL 1744343 (D. Del. 2015). *See id.* That case involved a patent “directed to a problem unique to text-message telecommunication between a mobile device and a computer.” *Messaging Gateway Sols.*, 2015 WL 1744343, at *5. Addressing a limitation in conventional technology where “phones could not send SMS text messages to computers,” the patent in *Messaging Gateway Solutions* provided a solution “tethered to the technology that created the problem.” *Id.* The patent’s solution specified how the interaction between a phone and computer could be manipulated so that the phone could send a message in its language (SMS text) that could then be received and understood by the computer in its language (Internet Protocol message). *See id.* at *2–3, *5. Thus, the patent in *Messaging Gateway Solutions* was patent-eligible because it was “firmly rooted in technology” and “addressed . . . a specific problem arising in the realm of mobile device-to-Internet communication.” *Id.* at *6.

Wolverine’s attempted analogy to *Messaging Gateway Solutions* does not make sense. The ’689 Patent does not address a specific technological problem like the phone-to-computer communication problem addressed in the patent in *Messaging Gateway Solutions*. Instead, the ’689 Patent addresses the business problem of finding another way for customers to pay.

Wolverine seems to think of “e-commerce” as a technological realm and argues that the ’689 Patent’s method of setting up individual accounts and allowing their use was “not possible prior to the claimed invention.” *See* Doc. 29, Resp., 8 (citing ’689 Patent at 3:40–67). But e-commerce is not a technological realm. It is a commercial one. And, most importantly, the ’689 Patent does not even arguably introduce any new technology to that commercial realm. The ’689 Patent might introduce

a new method for doing commerce, but that method, as explained above, is no more than the abstract idea of setting up and allowing the use of individual store accounts. Even if no one before thought of that method, "a claim for a *new* abstract idea is still an abstract idea." *Synopsys*, 839 F.3d at 1151.

When the "alleged 'inventive concept' that solves problems identified in the field" is the "abstract idea itself," there is no inventive concept sufficient to save the patent at *Alice* step two. *See ChargePoint*, 920 F.3d at 774. With nothing in the '689 Patent's claims besides the abstract idea of setting up and allowing the use of individual store accounts, the '689 Patent is ineligible for patent protection.

C. *Leave to Amend Would be Futile.*

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015) (citations omitted). "Denial of leave to amend is appropriate where there is no indication that amendment would cure the defects in a complaint." *Id.* "No amendment to a complaint can alter what a patent itself states." *Sanderling Mgmt. Ltd v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023). The Court has scrutinized the '689 Patent and Wolverine's allegations and arguments for anything that might save the '689 Patent from ineligibility. Finding nothing, the Court concludes that the '689 Patent is ineligible for patent protection, and allowing Wolverine another chance at pleading would be futile.

**IV.**

**CONCLUSION**

Albertsons's Motion to Dismiss (Doc. 24) is **GRANTED** because the '689 Patent claims a patent-ineligible abstract idea, and the case is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

**SO ORDERED.**

**SIGNED: July 9, 2026.**

**JANE J. BOYLE**
**SENIOR UNITED STATES DISTRICT JUDGE**