**2026-2113**

# United States Court of Appeals for the Federal Circuit

---

**WOLVERINE BARCODE IP LLC,**

*Plaintiff-Appellant,*

v.

**ALBERTSONS COS. INC.,**

*Defendant-Appellee.*

---

Appeal from the United States District Court for the Northern District of Texas in No. 3:25-cv-01448-B, Senior Judge Jane J. Boyle

---

## CORRECTED BRIEF FOR PLAINTIFF-APPELLANT WOLVERINE BARCODE IP LLC

William P. Ramey, III
RAMEY LLP
446 Heights Blvd., Suite 200
Houston, Texas 77007
(713) 426-3923
wramey@rameyfirm.com

***Counsel for Plaintiff-Appellant Wolverine Barcode IP***

**CLAIM 1 OF U.S. PATENT NO. 9,280,689**

1. A method for conducting offline electronic commerce transactions having a vendor barcode scanner and a vendor cash register comprising:

(a) providing a personal code to a person for their use to purchase goods;

(b) converting said personal code into barcode format to form a User ID Barcode, said User ID Barcode corresponding to said personal code and including at least one special character to distinguish the barcode as a User ID Barcode from a product barcode;

(c) storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor;

(d) establishing a User Account in a User Vendor Management Server corresponding to said personal code;

(e) depositing funds in said User Account to establish a credit limit;

(f) conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server;

(g) detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server;

(h) comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server;

(i) forwarding the approval signal to the vendor cash register; and

(j) repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode.

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Wolverine Barcode IP LLC certifies the following pursuant to Federal Circuit Rules 26.1 and 47.4 (Form 9):

1. *Represented Entities.* The full name of every entity represented by undersigned counsel in this case: Wolverine Barcode IP LLC.

2. *Real Party in Interest.* The name of every real party in interest represented by undersigned counsel, if different from the entity above: None.

3. *Parent Corporations and Stockholders.* All parent corporations and any publicly held companies that own 10% or more of the stock of the represented entity: None.

4. *Legal Representatives.* The names of all law firms and the partners or associates that appeared for the represented entity in the trial court or are expected to appear in this Court and are not already listed on the docket: Ramey LLP: William P. Ramey, III and Kirby Blair Drake, not expected to appear.

5. *Related Cases.* See the Statement of Related Cases, *infra*, provided pursuant to Federal Circuit Rules 47.4(a)(5) and 47.5(b).

- Case No. 2:26-cv-00285 *Wolverine Barcode IP, LLC v. Subway IP LLC* In the Eastern District of Texas
- Case No. 2:26-cv-00153 *Wolverine Barcode IP, LLC v. Walgreen Co*. In the Eastern District of Texas
- Case No. 2:26-cv-00016 *Wolverine Barcode IP, LLC v. Chipotle Mexican Grill, Inc.* In the Eastern District of Texas

6. *Organizational Victims and Bankruptcy Cases*. None.

Date: October 12, 2026

/s/ William P. Ramey, III
William P. Ramey, III

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................1
STATEMENT OF THE ISSUES........................................................................1
STATEMENT OF THE CASE..........................................................................2
A. The ’689 Patent .......................................................................................2
B. Proceedings Below ...................................................................................4
SUMMARY OF ARGUMENT ..........................................................................6
STANDARD OF REVIEW ..............................................................................9
ARGUMENT ...............................................................................................10
I. The District Court Erred at Alice Step One by Restating the Claims at a Level of Abstraction That Erased Their Claimed Architecture. ....................................10
A. The directed-to inquiry must be tethered to the claim language. ...............10
B. Claim 1 recites a specific means, not the idea of a store account. ..............11
C. The district court’s focus dropped every limitation that makes the claims concrete. ..........................................................................................13
D. Western Express, Solutran, and Secured Mail do not support the judgment. ........................................................................................14
II. At a Minimum, the District Court Resolved Disputed Questions of Fact Against Wolverine at Alice Step Two, in Conflict with Berkheimer, Aatrix, and Cellspin. ...........................................................................................16
A. Conventionality is a question of fact that cannot be resolved against the non-movant on the pleadings. ..........................................................16
B. The ’689 patent itself makes factual assertions about the 2010–2011 state of the art that placed conventionality in genuine dispute. .......................17
C. The court’s categorical refusal to consider the specification was legal error. 21
D. The claimed ordered combination is the kind this Court has repeatedly held can supply an inventive concept. ..........................................................22
III. Dismissal with Prejudice Was an Abuse of Discretion. ............................26
IV. The Judgment Cannot Be Affirmed on the Infringement Grounds the District Court Declined to Reach. ...................................................................27
A. Remand, not first-instance affirmance, is the proper course. .................27

B. In any event, the complaint plausibly alleges that Albertsons performs or directs and controls every claimed step. ........................................................28

C. The indirect-infringement allegations likewise survive or, at minimum, warrant amendment. ..........................................................................................30

CONCLUSION ........................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) ........................................................................ 1, 2, 5, 7, 8, 16, 21, 26

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc)..................................................................................09, 28, 29

*AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27 (Fed. Cir. 2024) ....................................9

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).........01, 10, 16, 22, 25

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016) ..........................................................................................08, 24, 25

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) .....................................................................................08, 23, 25

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) .. 1, 5, 7, 8, 9, 16, 20- 22, 26

*Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342 (Fed. Cir. 2021)....................09, 28

*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020) .....................12

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019) ....................................................................... 1, 8, 16, 17, 20, 24, 25

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021) ..........................................................................................08, 10, 20

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) .............................................................28

*Diamond v. Diehr*, 450 U.S. 175 (1981).........................................08, 22, 23, 25

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)............12

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256 (Fed. Cir. 2018).....09, 28

*Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)................10

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) .........06, 10, 14, 16

*Foman v. Davis*, 371 U.S. 178 (1962) ..............................................................09, 27

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002) ..............................................................................................09, 27

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323 (Fed. Cir. 2012)....................................................................................................30

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017) ................29

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009)...........................09, 16

*Lyda v. CBS Corp.*, 838 F.3d 1331 (Fed. Cir. 2016) ..............................................29

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) ....................10, 12
*Messaging Gateway Sols., LLC v. Amdocs, Inc.*, No. 14-732-RGA, 2015 WL 1744343 (D. Del. Apr. 15, 2015)....................13
*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011)....................16
*Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018)....................29
*Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698 (Fed. Cir. 2023)..............06, 8, 26
*Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017)....................14, 15
*Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161 (Fed. Cir. 2019)....................14, 15
*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311 (Fed. Cir. 2015)....................9
*W. Express Bancshares, LLC v. Green Dot Corp.*, 816 F. App'x 485 (Fed. Cir. 2020) (nonprecedential)....................14

**Statutes and Rules**

28 U.S.C. § 1295(a)(1)....................1
28 U.S.C. § 1331....................1
28 U.S.C. § 1338(a)....................1
35 U.S.C. § 101.................... 5, 6, 9, 10, 16, 20, 26, 28
Fed. R. App. P. 4(a)(1)(A)....................1
Fed. R. Civ. P. 12(b)(6)....................05, 9, 21
Fed. R. Civ. P. 15(a)....................09, 27

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), no other appeal in or from this civil action has previously been before this or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(b), counsel is aware of the following pending cases that may directly affect or be directly affected by this Court's decision because each asserts U.S. Patent No. 9,280,689:

- Case No. 2:26-cv-00285 *Wolverine Barcode IP, LLC v. Subway IP LLC* In the Eastern District of Texas
- Case No. 2:26-cv-00153 *Wolverine Barcode IP, LLC v. Walgreen Co*. In the Eastern District of Texas
- Case No. 2:26-cv-00016 *Wolverine Barcode IP, LLC v. Chipotle Mexican Grill, Inc.* In the Eastern District of Texas

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the patent laws of the United States. The district court entered a memorandum opinion and order granting Albertsons' motion to dismiss on July 9, 2026, Appx0002-Appx0021, and entered final judgment the same day, Appx0001. The judgment disposed of all claims of all parties. Wolverine filed its notice of appeal on July 27, 2026, Appx0326-Appx0327, within the thirty days allowed by Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred at *Alice* step one by restating claims 1–3 of U.S. Patent No. 9,280,689 as "setting up individual customer accounts and allowing those accounts to be used for purchases" — a formulation that omits every limitation making the claims concrete, including the claimed User ID Barcode marked with a special character so that the vendor's existing product scanner can distinguish user identification from product identification within a single scan stream.

2. Whether the district court erred at *Alice* step two by resolving the factual question of conventionality against the non-movant on the pleadings, contrary to *Berkheimer*, *Aatrix*, and *Cellspin*, and by refusing as a matter of law to consider specification-supported allegations of unconventionality.

3. Whether the district court abused its discretion by dismissing with prejudice and denying leave to amend as futile, where Wolverine had never amended its complaint and where amendment could supply the factual eligibility allegations that *Aatrix* holds sufficient to defeat dismissal.

4. Whether the judgment may be affirmed on the alternative infringement grounds the district court expressly declined to reach, where the complaint and its claim chart plausibly allege that Albertsons performs, or directs and controls, every step of the claimed method.

## STATEMENT OF THE CASE

### A. The ’689 Patent

U.S. Patent No. 9,280,689, entitled “Method and Apparatus for Conducting Offline Commerce Transactions,” issued on March 8, 2016 from an application claiming priority to a September 21, 2010 provisional. (Appx0028-Appx0034 ¶ 6, Appx0035-Appx0061). The patent addresses a problem the specification frames in concrete terms: as of the 2011 filing, customers paid for goods priced at micro-payment levels in cash because “the cost of the credit card transaction processing is too high,” making card processing impractical for such purchases for vendors and card networks alike. ’689 patent at 1:26–31; Appx0003.

The specification’s answer was not a new account type in the abstract. It “introduces a new method for identifying a user using the User ID Barcode,” ’689

patent at 2:34–35, built so that the vendor's existing point-of-sale equipment — the same barcode scanner and cash register already deployed at every checkout lane — could capture the user's identity in the same scan stream as the products being purchased. The claimed mechanism is specific. A personal code is converted "into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish the barcode as a User ID Barcode from a product barcode." (Appx0003, claim 1(b)). The purchase step requires "scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register," claim 1(f), so that a single scanner captures both data types and the vendor server can separate them by detecting the special character, claim 1(g). The server forwards the identifier and price to a User Vendor Management Server, which compares price against available funds and, if funds suffice, returns "an approval signal" that is "forward[ed] . . . to the vendor cash register." Claims 1(h)–(i); Appx0004. Step (j) repeats the purchase loop for subsequent transactions using the same barcode. Dependent claims 2 and 3 recite storage of the User ID Barcode on a cell phone or on a label secured to a credit card or cell phone.

The specification grounds this design in a series of factual assertions about the state of the art. It asserts that micro-payment purchases "are not made with credit cards because the cost of the credit card transaction processing is too high," '689 patent at 1:26–31, Appx0053; that RFID and NFC payment "require the user to load

the cell phone with money using a special machine available only at banks or limited places" while "[v]ery few vendors have a non-contact card reader," *id.* at ll. 32-43; that contactless stored-value cards such as SUICA and PASMO worked "only within Japan" at vendors with special readers, *id.* at ll. 53-60; and that, by contrast, "practically all store cash registers worldwide are equipped with barcode scanners," *id.* at 2:39-58, so that capture through the existing scanner "provides fast checkout and with limited cost to the vendor," whereas "[v]endors will be required to install RFID or NFC chip reader as new investments" under the alternatives, *id.* at 7:4–6, Appx0056. The specification also describes the advantages of the claimed architecture, including automatic registration "without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode," *id.* at 4:29–33, Appx0054; purchasing "without the need to provide each vendor the user's personal information," *id.* at 4:25–28; and improved "security for the user's personal sensitive information," *id.* at 5:66–67, Appx0055.

**B. Proceedings Below**

Wolverine sued Albertsons on June 6, 2025, alleging that the Albertsons Cash mobile-payment service infringes claims 1–3. (Appx0028-Appx0034 ¶¶ 6–12). The complaint attached a limitation-by-limitation claim chart mapping each step of claim 1 onto Albertsons' own public documentation. (Appx0062-Appx0083). The chart alleges, among other things, that when a customer opens the Albertsons app and

selects Albertsons Cash, "the system generates a one-time 3PL code"; that Albertsons Cash "converts that exact token into a barcode" prefixed with "3PL:" to signal that it is a User ID barcode rather than a product barcode; that Albertsons stores the token; that the checkout system scans and detects the barcode, compares the price against the customer's balance, and applies approved purchases to the account. (Appx0065-Appx0081).

Albertsons moved to dismiss under Rule 12(b)(6), arguing ineligibility under § 101 and, in the alternative, that the complaint fails to allege single-actor direct infringement or indirect infringement. (Appx0139-Appx0157). Wolverine opposed, invoking *Berkheimer* and *Aatrix*, identifying factual allegations and specification disclosures of unconventionality, and requesting leave to amend if the court found any pleading deficiency. (Appx0179-Appx0183).

The district court granted the motion. (Appx0002-Appx0021). At step one, the court rejected both parties' statements of the claims' focus — faulting Albertsons' "verifying a customer's ability to pay" framing because "it overgeneralizes and describes the claims at too high a level of abstraction," Appx0012 — and then adopted its own: the claims are "directed to the abstract idea of setting up individual customer accounts and allowing those accounts to be used for purchases." (Appx0011). At step two, the court held that the inventive features Wolverine identified could not be considered because they "come from the

specification, rather than the claims," and that "a specification cannot supply the inventive concept." (Appx0016). It found no arguably inventive concept in any element or in the ordered combination, Appx0017-Appx0018, dismissed with prejudice, and denied leave to amend as futile on the ground that "[n]o amendment to a complaint can alter what a patent itself states." (Appx0020) (quoting *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023)). The court expressly declined to reach Albertsons' infringement arguments, Appx0006, and entered final judgment. (Appx0001). This appeal followed. (Appx0326-Appx0327).

## SUMMARY OF ARGUMENT

The district court condemned claims that it never accurately described. The court warned, correctly, that a defendant's framing fails when it "overgeneralizes and describes the claims at too high a level of abstraction." (Appx0012). It then committed the same error. Its stated focus, "setting up individual customer accounts and allowing those accounts to be used for purchases," contains no barcode, no special character, no scanner, no server, and no approval signal. It is a description from which every claim limitation has been removed. *Enfish* holds that describing claims "at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." 822 F.3d at 1337. What the claims actually recite is a specific technical architecture: a user identifier converted into barcode format and marked with "at least one special

character" precisely so the vendor's existing *product* scanner can capture identity and merchandise in one scan stream and the vendor server can separate the two, followed by a defined round trip to a management server and an approval signal returned to the register. That is a particular means of solving a problem, card-processing costs that made micro-payments impractical, that arose in point-of-sale payment technology, and the solution is tethered to that technology. The claims survive step one.

At a minimum, the judgment cannot stand at step two. Whether a claim element or combination "is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," and any fact pertinent to invalidity "must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. Dismissal is proper "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix*, 882 F.3d at 1125. The '689 specification itself supplies those allegations: it asserts, as fact, that card networks had priced micro-payments out of electronic processing; that RFID and NFC required special loading machines and vendor-side readers "very few vendors" had; that contactless stored-value cards worked only in Japan and forfeited funds when lost; that the one device every vendor already owned was a product barcode scanner; and that the claimed special-character design, letting that existing scanner carry identity and merchandise in one separable stream, at "limited cost to

the vendor," did what no alternative did. Those are the same kind of specification-anchored improvements that created a factual dispute in *Berkheimer* itself, that carried the *CosmoKey* patentee past step two on the pleadings, and that required reversal in *Cellspin* and *Aatrix*. The district court refused to weigh them, holding categorically that "a specification cannot supply the inventive concept." Appx0016. That is legal error twice over: the features are captured in the claims, the special-character differentiation, the single-scanner capture, the server division of labor, the approval loop, and under *Diehr*, *BASCOM*, *Amdocs*, and *Cellspin*, an ordered combination of concededly known components is precisely where an inventive concept can reside. No evidence in this record shows the claimed arrangement was conventional in 2010–2011. The court cited none. It reasoned from generality, on a motion where every inference belonged to Wolverine.

The with-prejudice disposition compounds the error. Wolverine never amended. It asked for leave. *Aatrix* reversed a denial of leave to amend in precisely this posture, because a complaint can add factual allegations about the state of the art at the priority date, allegations outside the patent's four corners that *Sanderling*'s observation about the patent text does not reach. Denying Wolverine a single opportunity to plead those facts was an abuse of discretion.

Finally, the judgment cannot be affirmed on the infringement grounds the district court expressly declined to decide. Those questions belong to the district

court in the first instance. And they would fail in any event: the claim chart alleges that Albertsons' own system performs the generation, conversion, storage, detection, comparison, and approval steps, and that Albertsons conditions participation in Albertsons Cash on customer performance of the remaining steps while establishing their manner and timing, the attribution rule of *Akamai*, 797 F.3d at 1023. Under *Bot M8* and *Disc Disease*, those allegations state a plausible claim.

## STANDARD OF REVIEW

This Court applies regional-circuit law, here, the Fifth Circuit's, to the procedural question whether a complaint states a claim, and its own law to substantive issues of patent law. *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015); *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024). A Rule 12(b)(6) dismissal is reviewed de novo, accepting all well-pleaded facts as true and drawing all reasonable inferences in the plaintiff's favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Patent eligibility under § 101 is a question of law, based on underlying facts, reviewed de novo. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). Denial of leave to amend is reviewed for abuse of discretion, *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002), mindful that leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

# ARGUMENT

## I. The District Court Erred at Alice Step One by Restating the Claims at a Level of Abstraction That Erased Their Claimed Architecture.

### *A. The directed-to inquiry must be tethered to the claim language.*

Step one asks what the claims are "directed to" — their "focus" and "character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). The inquiry identifies "the focus of the claimed advance over the prior art," *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021), and it carries a discipline this Court has enforced repeatedly: the court "must be careful to avoid oversimplifying the claims," *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016), because "all inventions at some level embody, use, reflect, rest upon, or apply" abstract ideas, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (citation omitted). "[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). The operative question is "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." (Appx0009) (quoting *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017)).

***B. Claim 1 recites a specific means, not the idea of a store account.***

Read as this Court requires — in its entirety, limitation by limitation, in light of the specification — claim 1 recites a particular technical mechanism with three defining features, none of which appears in the district court's statement of the claims' focus.

*First*, the claim requires converting the personal code "into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish the barcode as a User ID Barcode from a product barcode." Claim 1(b). The special character is not decoration. It is the engineering choice that makes the rest of the claim possible: because user identification and product identification travel through the *same* scanner in the *same* scan stream, something in the data itself must tell the system which is which. The claim solves that problem in the encoding.

*Second*, the claim requires that each purchase include "scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register." Claim 1(f). The claim thus repurposes the vendor's existing point-of-sale hardware — one scanner, one register — to capture identity alongside merchandise, rather than requiring a card reader, a PIN pad, a signature-capture device, or any dedicated identification channel. The specification ties this design directly to the problem it solves: card-network processing costs made micro-payments impractical, '689 patent at 1:26–31 Appx0053, and capture "by the

cashier using the scanner available at the cash register" provides fast checkout "with limited cost to the vendor for the transaction processing." *Id.* at 7:1–3 Appx0056; Appx0140 (quoting same).

*Third*, the claim recites a defined data path with a defined division of labor: the vendor server — not the register, not the scanner — performs the "detecting" of the special-character-marked barcode and forwards identifier and price to the User Vendor Management Server, claim 1(g); the management server performs the funds comparison and issues the approval signal, claim 1(h); and the approval signal travels back through the vendor server to the register, claim 1(i), closing a loop the claim then requires to repeat, claim 1(j). This is an architecture. It specifies which component does what, in what order, with what data.

A claim with that content is "directed to a specific means or method," not to "an abstract end-result." This Court's cases resolving step one for the patentee involve exactly this posture: claims that recite a particular asserted technical improvement, read in light of a specification explaining the problem and the mechanism. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368–71 (Fed. Cir. 2020) (step one resolved for patentee where claims recited a specific device configuration for an asserted improvement); *McRO*, 837 F.3d at 1313–16 (specific claimed rules, not the general idea of automation); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–59 (Fed. Cir. 2014) (solution "necessarily

rooted" in the technology that created the problem). The persuasive reasoning of *Messaging Gateway* is on point as well: a claim is not abstract where the solution "is tethered to the technology that created the problem." 2015 WL 1744343, at 5. The problem here — payment-processing cost and friction at the physical point of sale — arose in POS technology, and the claimed solution operates through and upon that technology: its scanners, its registers, its servers, its data formats. (Appx0052-Appx0054).

### *C. The district court's focus dropped every limitation that makes the claims concrete.*

Against that claim language, place the district court's statement of the claims' focus: "setting up individual customer accounts and allowing those accounts to be used for purchases." (Appx0011). No barcode. No special character. No scanner. No scan stream. No server architecture. No approval signal. The formulation is not a summary of claim 1; it is what remains after claim 1 has been deleted. And the court reached it moments after rejecting Albertsons' own framing — "verifying a customer's ability to pay" — because "it overgeneralizes and describes the claims at too high a level of abstraction." (Appx0012). The court saw the error. It then repeated it at a marginally lower altitude.

The opinion's own walk through the claim confirms the mismatch. The court grouped steps (a) through (e) as "the setup" and steps (f) through (j) as using the

account, Appx0013-Appx0014, a grouping that treats "converting said personal code into barcode format" with a distinguishing special character as interchangeable with handing a customer a punch card. It is not. The special-character limitation answers a machine-level question — how does one scanner's data stream carry two different kinds of information without confusing them — that has no analogue in the "basic concept" of an account. When the character of a claim "as a whole" is at issue, a focus statement that accounts for none of the claim's distinguishing limitations cannot carry the analysis. *Enfish*, 822 F.3d at 1337.

### ***D. Western Express, Solutran, and Secured Mail do not support the judgment.***

The district court reasoned by analogy to three decisions. None fits, and the first should not have anchored the analysis at all.

*Western Express* is a nonprecedential disposition. 816 F. App'x 485 (Fed. Cir. 2020). It binds no one, and the claims there recited "the basic concept of a payment card" with a funds-transfer step — no scanner, no dual-purpose scan stream, no encoding mechanism distinguishing data types. (Appx0014) (describing *Western Express*). The district court acknowledged that the analogy required recasting the '689 claims so that "the 'payment card' is instead an individual account at a store." (Appx0014). An analogy that works only after the claims are rewritten is not an analogy; it is the over-abstraction *Enfish* forbids.

*Solutran* fails for the reason the district court itself recorded: the *Solutran* claims "did not improve the technical capture of information from a check" and did not "improve how a check is scanned." (Appx0015) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1167 (Fed. Cir. 2019)). The claimed advance there was *when* to credit an account — pure sequencing. The claimed advance here is *how* the capture itself works: a special-character-marked identifier designed so a product scanner can ingest identity and merchandise together and the system can tell them apart. That is precisely the scan-side technical content whose absence doomed the *Solutran* claims.

*Secured Mail* involved identifiers affixed to mail to "communicate information" about the mail object, where the claim language did "not explain how the sender generates the information." 873 F.3d 905, 911–12 (Fed. Cir. 2017); Appx0017-Appx0018. The *Secured Mail* claims solved no scanner-side differentiation problem; nothing in them concerned how one scanning system distinguishes categories of data in a single stream. Claim 1(b) does exactly that, and says how: "at least one special character to distinguish the barcode as a User ID Barcode from a product barcode." The distinction the *Secured Mail* panel found missing — claim language supplying the mechanism — is present here.

Because the district court's step-one holding rests on a focus statement untethered from the claims and on inapposite comparisons, it should be reversed.

The claims are directed to a specific asserted improvement in point-of-sale transaction technology, and the § 101 inquiry ends at step one. *Enfish*, 822 F.3d at 1339.

## II. At a Minimum, the District Court Resolved Disputed Questions of Fact Against Wolverine at Alice Step Two, in Conflict with Berkheimer, Aatrix, and Cellspin.

### *A. Conventionality is a question of fact that cannot be resolved against the non-movant on the pleadings.*

If the Court reaches step two, the governing rules are settled. "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368 (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)). Eligibility may be decided on the pleadings "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). The patent attached to the complaint is part of the pleading for this purpose, *id.*, so its factual statements about the state of the art stand on the same footing as any other well-pleaded allegation: they must be taken as true and read in the light most favorable to the patentee. *Lormand*, 565 F.3d at 257. And the analysis begins from the premise the district court itself recited: "patents granted by the Patent and Trademark Office are

presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019); Appx0005.

### *B. The '689 patent itself makes factual assertions about the 2010–2011 state of the art that placed conventionality in genuine dispute.*

This is not a case in which the patentee asked the district court to take unconventionality on faith. The '689 specification makes a series of concrete, testable factual assertions about what point-of-sale payment technology could and could not do at the priority date — assertions that describe the technological landscape, identify the specific shortcomings of every then-existing alternative, and explain what the claimed architecture changed. Each was before the district court. Each had to be credited. The specification asserts:

1. *Card networks had priced micro-payments out of electronic processing entirely.* Micro-payment purchases "are not made with credit cards because the cost of the credit card transaction processing is too high, making it impractical both for vendors and credit card companies to accept the use of a credit card for micro payment purchases." '689 patent at 1:26–31. (Appx0053).

2. *RFID and NFC payment required special-purpose infrastructure on both sides of the transaction.* Those methods "require the user to load the cell phone with money using a special machine available only at banks or limited places," a "non-contact card reader is required at the vendor site," and "[v]ery few vendors have a non-contact card reader. Therefore these payment methods are inconvenient for users."

*Id.* at ll. 32-43. that contactless stored-value cards such as SUICA and PASMO worked "only within Japan" at vendors with special readers, *id.* at ll. 53-60; and that, by contrast, "practically all store cash registers worldwide are equipped with barcode scanners," *id.* at 2:39-58, so that capture through the existing scanner "provides fast checkout and with limited cost to the vendor," whereas "[v]endors will be required to install RFID or NFC chip reader as new investments" under the alternatives, *id.* at 7:4–6 (Appx0056). The specification also describes the advantages of the claimed architecture, including automatic registration "without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode," *id.* at 4:29–33 (Appx0054).

3. *Contactless stored-value cards were geographically confined and lossy.* The SUICA, PASMO, Edy, and QUICPay cards "can be used only at vendors having the special non-contact card reader" and "only within Japan since the special non-contact card reader are rarely available outside of Japan," and if such a card "is lost, the remaining money in the card is lost." *id.* at ll. 53-60.

4. *The remaining alternatives imposed checkout friction.* "[U]sing a debit card often requires entering of a PIN, and/or the signature on a sales receipt," cash "require[s] the user to carry cash" and the cashier "to count the money and provide change," and "[b]oth payment methods take time and slow the completion of the purchasing transaction." *Id.* at 6:41-58 (Appx0055).

5. *The one piece of hardware every vendor already had was a product barcode scanner.* "[P]ractically all store cash registers worldwide are equipped with barcode scanners." *id.* at 2:39-58 (Appx0053).

6. *The special character is what makes a single scan stream separable.* Because the User ID Barcode is prefixed with a special character, "the system can distinguish the User ID Barcode from the product data barcode within the data captured by the barcode scanner." *Id.* at 3:15-30 (Appx0054).

7. *The claimed design eliminated new vendor investment; the alternatives demanded it.* Capture of the User ID Barcode "by the cashier using the scanner available at the cash register[] provides fast checkout and with limited cost to the vendor for the transaction processing," whereas "[v]endors will be required to install RFID or NFC chip reader as new investments if the system uses RFID or NFC technology." *id.* at 7:4–6 (Appx0056).

8. *The architecture protects the user's identity.* The design permits purchasing "without the need to provide each vendor the user's personal information," *id.* at 4:25–28, and permits automatic registration "without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode," *id.* at 4:29–33 (Appx0054), with improved "security for the user's personal sensitive information," *id.* at 5:66–67(Appx0055).

Taken as true, these assertions describe a 2010–2011 landscape in which no existing system carried user identification through the vendor's ordinary product-scan stream: every alternative demanded new hardware, special loading machines, geographic proximity to proprietary readers, or checkout friction, and the claimed combination — a special-character-marked identifier ingested by the scanner every vendor already owned, separated at the vendor server, and verified at a remote management server — did not exist. Whether that account of the art is accurate is quintessentially a question for evidence, not for a motion to dismiss.

This Court's decisions treat exactly this kind of intrinsic factual record as sufficient to defeat early § 101 disposition. In *Berkheimer*, the specification asserted that storing parsed data in "a purportedly unconventional manner" "eliminates redundancies," improves efficiency, and enables one-to-many editing; this Court held that "[t]he improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities," and vacated summary judgment as to the claims that captured them. 881 F.3d at 1369–70. In *CosmoKey*, the specification's own description of prior authentication methods and their shortcomings — and its statement that the claimed activation-timing steps departed from them — carried the patentee past step two on the pleadings. 15 F.4th at 1097–99. In *Cellspin*, plausible allegations that arranging concededly known devices in a

particular way — capturing data on one device, then publishing it through a separate, paired connection — was unconventional required reversal of a Rule 12(b)(6) dismissal. 927 F.3d at 1316–18. And in *Aatrix*, allegations that the claimed data-file structure improved on existing importation methods had to be accepted, making dismissal improper. 882 F.3d at 1127–28. The '689 specification's assertions are of the same character — more detailed than most, because they name the competing systems, identify their specific defects, and tie the claimed design to the elimination of each.

### ***C. The court's categorical refusal to consider the specification was legal error.***

Rather than confront that factual record, the district court ruled it out of bounds. The inventive features Wolverine identified, the court held, "come from the specification, rather than the claims," and "a specification cannot supply the inventive concept." Appx0016. *Berkheimer* forecloses that reasoning by its terms: the improvements in the specification, "to the extent they are captured in the claims," create the factual dispute. 881 F.3d at 1369. The specification is not a forbidden source at step two; it is where the factual case for unconventionality lives. The only question *Berkheimer* directs a court to ask is whether the claims capture the asserted improvements.

These claims do. The separability improvement (assertion 6) is claim 1(b) — "at least one special character to distinguish the barcode as a User ID Barcode from

a product barcode" — and claim 1(g), which requires "detecting the User ID Barcode at the vendor server." The existing-scanner, no-new-hardware improvement (assertions 5 and 7) is claim 1(f) — scanning products and identifier alike "with a product barcode scanner at the vendor cash register." The privacy and registration improvements (assertion 8) are claims 1(c) through 1(e), which place the personal code with the user and in the management server rather than with any vendor. The friction improvements (assertions 1 and 4) flow from the combination of 1(f) through 1(i): one scan, one automated comparison, one approval signal — no PIN, no signature, no cash handling. This is the *Berkheimer* posture precisely: specification-asserted improvements, captured in claim limitations, disputed by no record evidence. In *Berkheimer* that combination required vacatur of summary judgment, on a full evidentiary record. It requires at least as much on the pleadings.

### ***D. The claimed ordered combination is the kind this Court has repeatedly held can supply an inventive concept.***

The district court's alternative ground — that the ordered combination adds nothing because it is merely "a logical ordering" of steps that is "not an arguably inventive way of using known technology," Appx0018 — misunderstands what the ordered-combination inquiry protects. The Supreme Court has been explicit that "a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diamond v. Diehr*, 450 U.S. 175, 188 (1981); *see Alice*,

573 U.S. at 217–18 (reaffirming *Diehr*). Three of this Court's decisions show what that principle means in practice — and each maps onto the '689 architecture.

*BASCOM* is the location case. Every component there was admittedly generic — Internet-content filtering software, ISP servers, user accounts — and filtering itself was an abstract idea. The inventive concept lay in *where* the pieces were placed: a filtering tool installed at a specific, remote location on the ISP's server, associated with individual user accounts, which gave each user customized filtering without local software. 827 F.3d at 1350. "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* The '689 claims make the same kind of placement decisions, for the same kind of engineering reasons. Identity capture is placed *inside the product scan stream*, at the one device the specification says every vendor already owns (assertion 5) — not at a new card reader, not at a bank loading machine. Detection is placed *at the vendor server*, claim 1(g), so the register and scanner need no modification at all. Funds verification is placed *at a remote management server* holding the deposited balance, claim 1(h), so no vendor ever touches the user's personal information (assertion 8). As in *BASCOM*, the components are familiar; the architecture — which function sits where, and why — is the claimed advance, and it is what eliminates the new-hardware investment the specification says every rival approach required (assertion 7).

*Amdocs* is the distribution case. The claims there used generic network components — gatherers, information source modules, a central manager — but arranged them so that accounting data was enhanced in a distributed fashion, close to its source, rather than funneled to a central database; that distributed architecture was an unconventional technological solution to a technological problem, and it supplied the inventive concept even though each component, in isolation, was conventional. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300–02 (Fed. Cir. 2016). Claim 1 distributes its transaction pipeline the same way: the scanner captures both data types in one pass; the vendor server — not the register, and not the remote server — performs the sorting, detecting the special character and forwarding only the identifier and price, claim 1(g); the management server performs the comparison and issues the approval, claim 1(h); and the approval flows back down the same path to the register, claim 1(i). Work is positioned at the network node best suited to perform it, which is precisely the architectural judgment *Amdocs* credited.

*Cellspin* is the ordering case. Digital cameras, mobile phones, and short-range pairing were all known; the claimed advance was the sequence — capture data on one device first, establish a paired connection, then publish through the second device — and this Court held that plausible allegations that this ordering was unconventional defeated dismissal. 927 F.3d at 1316–18. The ’689 claims are order-

dependent in the same non-optional way. The special character must be embedded at *conversion*, claim 1(b), before any scan occurs — otherwise the single scan stream of claim 1(f) cannot be separated afterward. Detection at the vendor server, claim 1(g), must *precede* the forwarding of identifier and price, or the management server receives an undifferentiated stream. Comparison, claim 1(h), must precede the approval signal, and the approval must travel back through the vendor server to the register, claim 1(i), to complete the purchase the scan began. And step (j)'s repetition loop is what converts a one-time registration into a standing micro-payment capability — the answer to the specification's core economic problem (assertion 1). The district court called this "logical ordering," as if the sequence were happenstance. It is not happenstance; it is the design. Each step sits where it does because the single-scanner, dual-data-type architecture does not function otherwise.

Set against *Diehr*, *BASCOM*, *Amdocs*, and *Cellspin*, the district court's ordered-combination analysis reduces to the observation that barcodes, scanners, and servers were individually old. Appx0017-Appx0018. Wolverine never contended otherwise — no more than the *BASCOM* patentee claimed to have invented filtering software or the *Cellspin* patentee Bluetooth. Novelty of components has never been the test. *Alice*, 573 U.S. at 217. The test is whether the *combination, as ordered*, was well-understood, routine, and conventional in 2010–2011, and on that question the record contains nothing: no prior-art reference, no

admission, no judicially noticeable material — only the specification's contrary factual assertions, which were entitled to the truth. The court's conclusion that the arrangement was "not an arguably inventive way of using known technology," Appx0018, is a finding about the state of the art, made without evidence, on a motion to dismiss, against the party holding both the pleading-stage inferences and a presumption of validity. *Berkheimer* does not permit it.

## III. Dismissal with Prejudice Was an Abuse of Discretion.

Wolverine filed one complaint. It never amended. When Albertsons moved to dismiss, Wolverine asked for leave to amend to cure any deficiency the court identified. (Appx0182-Appx0183). The district court refused, holding amendment futile because "[n]o amendment to a complaint can alter what a patent itself states." (Appx0020) (quoting *Sanderling*, 65 F.4th at 706).

*Sanderling* answers a different question. It addresses amendments that would contradict or supplement the patent's own text. It says nothing about the category of amendment *Aatrix* holds can defeat a § 101 dismissal: factual allegations about the state of the art at the priority date — what skilled artisans knew, what prior point-of-sale systems could and could not do, why the claimed arrangement was not routine. Those facts live outside the patent's four corners. In *Aatrix*, this Court reversed the denial of leave to amend precisely because the proposed pleading contained such allegations, which had to be taken as true. 882 F.3d at 1125–28.

Wolverine's amendment would do the same work here: allege, with specificity, that no 2010–2011 point-of-sale system conventionally carried user identification through the product scan stream via a special-character-marked barcode; that contemporaneous alternatives required dedicated card readers, PIN entry, or signature capture; and that the claimed server division of labor and approval loop was not a routine arrangement — each a factual proposition subject to proof, none an alteration of the patent.

Under Fifth Circuit law, leave is to be freely given, and denial without a substantial reason — undue delay, bad faith, repeated failure to cure, undue prejudice, or genuine futility — is an abuse of discretion. *Great Plains Trust*, 313 F.3d at 329; Fed. R. Civ. P. 15(a); *Foman*, 371 U.S. at 182. None of those reasons exists on this record: the request came at the earliest possible juncture, on the first complaint, in a case with no scheduling prejudice. At minimum, the with-prejudice disposition should be vacated and the case remanded with instructions to permit amendment.

## IV. The Judgment Cannot Be Affirmed on the Infringement Grounds the District Court Declined to Reach.

### *A. Remand, not first-instance affirmance, is the proper course.*

Albertsons moved to dismiss on non-infringement and indirect-infringement grounds as well, but the district court expressly did not decide them, observing that a ruling on infringement after holding the patent invalid would constitute an advisory

opinion. (Appx0006). Those questions were never adjudicated. This Court is "a court of review, not of first view," *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005), and if the § 101 judgment falls, the ordinary and proper disposition is remand for the district court to address the remaining grounds in the first instance on a full record.

### ***B. In any event, the complaint plausibly alleges that Albertsons performs or directs and controls every claimed step.***

Should the Court nonetheless consider the alternative grounds, they fail on the pleadings standard. A complaint states a claim for direct infringement when it contains factual allegations that, taken as true, "articulate why it is plausible that the accused product infringes the patent claim." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021); *see Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). Direct infringement of a method claim requires that all steps be "performed by or attributable to a single entity," and attribution exists "when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022–23 (Fed. Cir. 2015) (en banc). Whether that standard is satisfied is a question of fact. *Id.* at 1023.

The claim chart attributes the operative steps to Albertsons itself. Albertsons' "system generates a one-time 3PL code," Appx0065-Appx0066; "Albertsons Cash takes the internal authorization token . . . and converts it into a barcode" bearing the

"3PL:" prefix that distinguishes a User ID barcode from a product barcode, Appx0066-Appx0067; Albertsons "[c]ollects and retains that token," Appx0068-Appx0069; Albertsons establishes the linked user account, Appx0070-Appx0071; Albertsons' checkout system detects the barcode, captures the price, compares it against the customer's balance, and applies approved purchases, Appx0077-Appx0081. The steps in which a customer participates — scanning the code Albertsons generated at the register Albertsons operates, or loading funds through the app Albertsons designed — occur only within Albertsons Cash, a program Albertsons created, on terms Albertsons dictates: the chart quotes Albertsons' own terms providing that the app "will utilize the wireless capability of the mobile device . . . to communicate automatically with a Company point of purchase payment device, such as a cash register," whenever the device is in proximity and "scans the displayed QR Code." Appx0076. A customer cannot participate in Albertsons Cash at all except by performing those steps in the manner and at the time Albertsons' system prescribes. That is conditioning participation and establishing manner and timing — the *Akamai* rule — and at the pleading stage such attribution allegations suffice. *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018). *Lyda v. CBS Corp.*, 838 F.3d 1331 (Fed. Cir. 2016), on which Albertsons relied below, involved

a complaint that alleged no facts connecting the accused party to third-party conduct; the chart here does that work limitation by limitation.

### *C. The indirect-infringement allegations likewise survive or, at minimum, warrant amendment.*

Albertsons' attack on the indirect-infringement allegations rested first on the premise that no direct infringement was pleaded. (Appx0150). That premise fails for the reasons above: direct infringement is plausibly alleged with Albertsons as the single responsible actor, and in the alternative customers directly perform the method under Albertsons' instruction through an app that exists to walk them through each step. *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012). To whatever extent the district court on remand were to find the knowledge and intent allegations, Appx0028-Appx0034, insufficiently detailed, that is a defect of specificity curable by amendment — and a further reason the with-prejudice dismissal cannot stand.

## CONCLUSION

The judgment should be reversed and the case remanded for further proceedings. In the alternative, the judgment should be vacated and the case remanded, with instructions that Wolverine be granted leave to amend its complaint.

Respectfully submitted,

/s/ William P. Ramey, III
William P. Ramey, III

***Counsel for Wolverine Barcode IP LLC***

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)

The undersigned counsel of records for Appellants/Plaintiff, Wolverine Barcode IP LLC, certifies that this Principal Brief of Appellants/Plaintiff complies with the typeface requirement provided in Rule 32(a)(5) and type-volume limitation provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. In preparing this certificate, I relied on word-count program of Microsoft Office 365. This Brief contains 7,044 words.

Dated: October 12, 2026

/s/ William P. Ramey, III
William P. Ramey, III

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on October 12, 2026, via email by ECF filing.

/s/ William P. Ramey, III
William P. Ramey, III

# ADDENDUM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WOLVERINE BARCODE IP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-1448-B |
| | § | |
| ALBERTSONS COMPANIES, INC., | § | |
| | § | |
| Defendant. | § | |

## FINAL JUDGMENT

On July 9, 2026, this Court **GRANTED** Defendant Albertsons Companies, Inc.'s Motion to Dismiss (Doc. 24) and **DISMISSED WITH PREJUDICE** Plaintiff Wolverine Barcode IP LLC ("Wolverine")'s action after finding U.S. Patent No. 9,280,689 ineligible for patent protection under 35 U.S.C. § 101. It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that Wolverine takes nothing. This is a **FINAL ORDER AND JUDGMENT** that disposes of all parties and all claims and controversies in the above-captioned case.

**SO ORDERED.**

**SIGNED: July 9, 2026.**

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WOLVERINE BARCODE IP LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-1448-B |
| | § | |
| ALBERTSONS COMPANIES, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Albertsons Companies, Inc. ("Albertsons")'s Motion to Dismiss (Doc. 24) made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiff Wolverine Barcode IP LLC ("Wolverine") has filed a response (Doc. 29), and Albertsons has filed a reply (Doc. 30). For the reasons that follow, the Motion is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**.

## I.

## BACKGROUND

Wolverine owns U.S. Patent No. 9,280,689, which is titled "Method and Apparatus for Conducting Offline Commerce Transactions." *See* Doc. 1, Compl. ¶ 6; '689 Patent, Title. Albertsons operates grocery stores where customers can pay through their mobile devices using personal "Albertsons Cash" accounts. *See generally* Doc. 1-2, Compl. Ex. 2. In this lawsuit, Wolverine has accused Albertsons of directly and indirectly infringing the '689 Patent through the Albertsons Cash service. *See* Doc. 1, Compl. ¶¶ 8–12.

The ’689 Patent “relates to novel and improved methods and apparatuses for conducting offline transactions that use a barcode as a method of personal identification.” *Id.* ¶ 7. When the ’689 Patent was filed in 2011, customers would “pay for goods priced in micro payment levels, such as five cents or ten cents[,] using cash.” ’689 Patent at 1:26–27. Although credit cards were used for larger transactions, they were impractical for such small amounts because the transaction fee was too high relative to the purchase amount. *See id.* at 1:27–31. The ’689 Patent “introduce[d] a new method for identifying a user [i.e., customer] using the User ID Barcode, allowing the user to charge purchasing of goods priced in micro payment level or non-micro payment level either offline or online at a participating vendor site.” *Id.* at 2:34–38.

The ’689 Patent has three “claims,” or distinct inventions, that it covers. *See id.* at 17:30 to 18:34. Claim 1 is independent, and Claims 2 and 3 depend upon the claimed method in Claim 1. *See id.* Claim 1 reads:[1]

> 1. A method for conducting offline electronic commerce transactions having a vendor barcode scanner and a vendor cash register comprising:
>
> (a) providing a personal code to a person for their use to purchase goods;
>
> (b) converting said personal code into barcode format to form a User ID Barcode, said User ID Barcode corresponding to said personal code and including at least one special character to distinguish the barcode as a User ID Barcode from a product barcode;
>
> (c) storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor;
>
> (d) establishing a User Account in a User Vendor Management Server corresponding to said personal code;
>
> (e) depositing funds in said User Account to establish a credit limit;

[1] Mark this point in the opinion for easy future reference because the letter-labeled steps will come up again in the Analysis section.

> (f) conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server;
>
> (g) detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server;
>
> (h) comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server;
>
> (i) forwarding the approval signal to the vendor cash register; and
>
> (j)[2] repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode.

*Id.* at 17:31 to 18:29. Claim 2 adds: "The method of claim 1 wherein said User ID Barcode is stored by said person in a cell phone." *Id.* at 18:30–31. Claim 3 adds: "The method of claim 1 wherein said User ID Barcode is stored by said person on a label secured to a credit card or secured to a user's cell phone." *Id.* at 18:32–34.

Wolverine attached to its Complaint a chart with Claim 1's language, annotated depictions of how the Albertsons Cash system works, and some added description of how Albertsons allegedly infringes Claim 1. *See generally* Doc. 1-2, Compl. Ex. 2.

Albertsons moved to dismiss the Complaint on grounds that the '689 Patent is ineligible for patent protection and that Wolverine failed to plausibly allege infringement. *See generally* Doc. 24, Mot. Dismiss. The Court considers the motion to dismiss below.

---

[2] The '689 Patent erroneously labels this step with the letter "i." To avoid confusion, "j" is used here and throughout the Analysis section below to refer to Claim 1's ultimate step.

## II.

## LEGAL STANDARD

Fifth Circuit law governs the procedural question of whether Wolverine stated a plausible patent infringement claim. *See Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018) (citation omitted). The standard should be familiar: Rule 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering whether the plaintiff has stated a claim, courts must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).

Within this familiar inquiry, Federal Circuit law applies to all "substantive issues of patent law." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (citation omitted). That includes the two grounds for Rule 12(b)(6) dismissal asserted here: patent ineligibility and non-infringement.

For patent ineligibility, all "patents granted by the Patent and Trademark Office are presumptively valid." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011)). Nevertheless, a defendant can attempt to overcome the "presumption of validity" by "prov[ing] that the patent never should have issued in the first place." *Id.* (internal quotation mark omitted) (quoting *Microsoft*, 564 U.S. at 96–97). Patent

"[e]ligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citations omitted). "Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *Id.* (collecting cases).

The other asserted ground for dismissal—non-infringement—also requires reference to Federal Circuit law. *See AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024) (citation omitted) ("We apply our own law to the specific question of whether a complaint states a claim of patent infringement on which relief may be granted."). "[A]n adequate complaint need only contain 'some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Id.* (citation omitted). But if a court determines that a patent is invalid due to ineligibility, the court should not make a determination on infringement because it would "constitute[] an impermissible advisory opinion." *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718 (Fed. Cir. 2014) (Mayer, J., concurring) (citing *Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)).

## III.

## ANALYSIS

The '689 Patent claims a patent-ineligible abstract idea and is therefore invalid. To explain why, the Court first summarizes relevant portions of the legal framework for assessing patent eligibility. Next, the Court analyzes the '689 Patent according to that framework. Finally, the Court addresses why leave to amend would be futile.

A. *Assessing Patent Eligibility Involves a Two-Step Analysis.*

"Section 101 of the Patent Act defines the subject matter eligible for patent protection." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). Section 101 has four categories of patentable subject matter: "any new and useful [1] process, [2] machine, [3] manufacture, or [4] composition of matter." A patent may also be issued for "any new and useful improvement" in one of those four categories. § 101. "Other than as so limited, the patent system is described as available to 'anything under the sun that is made by man.'" *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).

But § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted). Those three patent-ineligible concepts are "the basic tools of scientific and technological work." *Id.* (citation omitted). To grant someone the exclusive right to a law of nature, natural phenomenon, or abstract idea would lead to "monopolization" that "might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (citation modified); *see* U.S. Const., art. I, § 8, cl. 8 ("The Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts . . . ."). Monopolization of these patent-ineligible concepts would be harmful because, as "the building blocks of human ingenuity," the concepts are *in* every patentable invention. *See Alice*, 573 U.S. at 217 (citation omitted).

Marking the line between patent-ineligible abstract ideas and patent-eligible processes invented using those ideas has proven to be a challenging task for courts. *See Internet Pats.*, 790 F.3d at 1345. Because many patents are "drafting effort[s] designed to monopolize" abstract ideas, *see Alice*, 573 U.S. at 221 (citation omitted), courts conducting an eligibility analysis under § 101 must

be careful not to be "deceived by the 'draftsman's art.'" *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 226). To help lower courts conduct the analysis, the Supreme Court in *Alice* established a two-step analytical framework. *See* 573 U.S. at 217–18.

1. <u>*Alice* Step One</u>

Step one is to "determine whether the claims at issue are directed to one of [the] patent-ineligible concepts," such as abstract ideas. *Id.* at 217 (citation omitted). What the patent claims are "directed to" involves "looking at the 'focus' of the claims, their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations and internal quotation marks omitted). More concretely, the inquiry requires identifying "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). When identifying the claims' "focus," a court must be careful not to generalize too broadly because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Solutran*, 931 F.3d at 1168 (quoting *Mayo Collab. Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)).

To identify the "focus," a patent's specification may be helpful, but its claim language is paramount. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). The specification is "useful in understanding 'the problem facing the inventor' as well as what the patent describes as the invention." *Id.* at 767. "But while the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to

the claim language in identifying that focus." *Id.* at 766. A court therefore does not err in identifying a "focus" of the claims that is "directly tethered to the claim language." *Solutran*, 931 F.3d at 1168.

Once a court has identified the claims' "focus," a court must determine whether that "focus" is a patent-ineligible concept. "The inquiry often is whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). "Limiting the invention to a technological environment does 'not make an abstract concept any less abstract under step one.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017)). Neither does "[a]dding one abstract idea . . . to another abstract idea . . . render the claim non-abstract." *RecogniCorp*, 855 F.3d at 1327.

At step one, the Federal Circuit and Supreme Court "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. As relevant to this case, "fundamental economic practice[s]" are patent-ineligible abstract ideas, "even where the financial transaction claimed includes physical components." *See W. Express Bancshares, LLC v. Green Dot Corp.*, 816 F. App'x 485, 486 (Fed. Cir. 2020) (citations omitted) (collecting Supreme Court and Federal Circuit cases). If "the innovative aspect of the claimed invention [is] an entrepreneurial rather than a technological one," the claim is not eligible for patent protection. *See Solutran*, 931 F.3d at 1166 (quoting *Ultramercial*, 772 F.3d at 722 (Mayer, J., concurring)).

2. *Alice* Step Two[3]

Step two—which should be reached only if a court determines at step one that the patent's claims are directed to an abstract idea—prompts the court to ask, "[w]hat else is there in the claims before us?" *Alice*, 573 U.S. at 217 (citation omitted). "To answer that question, [a court] consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 79, 78). Step two is the "search for an 'inventive concept.'" *Id.* at 217 (citation omitted). "An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (citing *Alice*, 573 U.S. at 222–23).

A patent is ineligible for protection when the patent's claims entirely lack concepts that could be considered inventive. *See, e.g.*, *Two-Way Media, Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338–39 (Fed. Cir. 2017). When a patent is directed to an abstract end-result, "[i]nquiry . . . must turn to any requirements for *how* the desired result is achieved." *Id.* at 1339 (quoting *Elec. Power Grp.*, 830 F.3d at 1355). Mere "invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." *Elec. Power Grp.*, 830 F.3d at 1355 (citations omitted).

[3] If parts of step two's framework sound the same as step one, that is somewhat by design. "[T]he two stages involve overlapping scrutiny of the content of the claims," and "there can be close questions about when the inquiry should proceed from the first stage to the second." *Elec. Power Grp.*, 830 F.3d at 1353 (citations omitted). Think of step two as a "lifeline" providing for more rigorous scrutiny after a patent fails step one. *See CosmoKey*, 15 F.4th at 1100 (Reyna, J., concurring).

At the motion-to-dismiss stage, a court should "search for an inventive concept in precisely the factors that [the plaintiff] argues comprises the inventive concept." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017). If "the alleged 'inventive concept' that solves problems identified in the field . . . is the abstract idea itself," the claim does not survive step two. *See ChargePoint*, 920 F.3d at 774.

B. *The '689 Patent is Ineligible for Patent Protection.*

Assessing the '689 Patent's claims at *Alice* step one, the Court determines that they are directed to the abstract idea of setting up individual customer accounts and allowing those accounts to be used for purchases. At step two, the Court concludes that the '689 Patent is ineligible for patent protection because it contains no inventive concept to transform the patent-ineligible abstract idea into a patent-eligible application of the idea.

1. At *Alice* Step One, the '689 Patent is Directed to the Abstract Idea of Setting Up Individual Customer Accounts and Allowing Those Accounts to be Used for Purchases.

The parties offer competing statements of the '689 Patent's "focus." Pulling from the '689 Patent's Abstract, Wolverine contends that the focus is "Methods and apparatus for conducting offline commerce transactions that use a barcode as an alternative means for personal identification." Doc. 29, Resp., 4 (quoting '689 Patent, Abstract). Albertsons asserts that the focus is "nothing more than verifying a customer's ability to pay." Doc. 24, Mot., 6.

Neither party's statement of the focus adequately captures the claims' "character as a whole." *See Elec. Power Grp.*, 830 F.3d at 1353 (citation omitted). To start, Wolverine's proffered focus comes only from the '689 Patent's Abstract and is altogether "untethered from the language of the claims." *See Enfish*, 822 F.3d at 1337 (citations omitted). Although Wolverine is correct that the '689 Patent's specification and Abstract may be consulted to illuminate the claims' focus, *see* Doc. 29, Resp., 4 &

n.20, "reliance on the specification must *always* yield to the claim language in identifying that focus." *ChargePoint*, 920 F.3d at 766 (emphasis added). The Court therefore rejects Wolverine's proffered focus.

Albertsons's proffered focus—"verifying a customer's ability to pay"—is also presented primarily through specification language, *see* Doc. 24, Mot., 5–6, but it fails because it overgeneralizes and describes the claims at too high a level of abstraction. *See Enfish*, 822 F.3d at 1337 ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." (citations omitted)). True, as discussed later in this subsection, "verifying a customer's ability to pay" is *an* abstract idea that is represented in the '689 Patent. But "the claims are not simply directed to *any* form of" verifying ability to pay, but "instead are specifically directed to" an idea on how to conduct transactions (which involves verifying ability to pay). *See id.* To Albertsons's credit, it gets much closer to identifying the proper focus when it says: "The claims, taken as a whole, require scanning a barcode, checking a server to see whether the customer has enough money, and then telling the register whether or not the customer has enough money." Doc. 30, Reply, 2.

Looking first to the specification to "illuminate" the claims' focus, "the problem facing the inventor" was finding a means to pay that does not use cash or a credit card. *See ChargePoint*, 920 F.3d at 766–67. Prior to the '689 Patent's issuance, small payments that were not worth the credit card transaction fee were made using cash. *See* '689 Patent at 1:26–31. To enable customers to pay without cash or a credit card, the '689 Patent "introduce[d] a new method for identifying a user using the User ID Barcode, allowing the user to charge purchasing of goods priced [at any level] either online or offline at a participating vendor site." *Id.* at 2:34–38. That newly introduced method

is "what the patent describes as the invention," *see ChargePoint*, 920 F.3d at 767, and is acknowledged by both parties. *Compare* Doc. 24, Mot., 5 (citing '689 Patent at 2:34–36), *with* Doc. 29, Resp., 5 & n.22 (citing '689 Patent at 2:34–38).

Guided by the specification's illumination, the Court determines that the '689 Patent's claims are directed to a process for setting up individual user accounts and allowing those accounts to be used for purchases. In Claim 1, steps (a) through (e) are the setup. Step (a) recites "providing a personal code to a person for their use to purchase goods." In step (b), the personal code is "convert[ed] into barcode format to form a User ID Barcode" that includes "at least one special character to distinguish" it from product barcodes. In step (c), both the customer and the vendor store the User ID Barcode: the customer (according to Claims 2 and 3) might store it on her cellphone or on a label affixed to her credit card or cellphone, and the vendor stores it in a "User Vendor Management Server." On the vendor's management server, the vendor then establishes a "User Account" for the particular user in step (d). In step (e), someone "deposit[s] funds in said User Account to establish a credit limit."

After steps (a) through (e), the individual accounts are ready to be used for repeated purchases. In step (f), the user "conduct[s] purchases at vendors" by scanning both product barcodes and the User ID Barcode. In step (g), the User ID Barcode is "detect[ed] and "forward[ed]," along with the purchase price, to the vendor's management server. In step (h), the vendor's management server "compar[es]" the price to the funds available in the user's account and, if the funds are sufficient, "send[s] an approval signal" back.[4] In step (i), the approval signal is "forward[ed] . . . to

[4] Step (h) is the "verifying a customer's ability to pay" that Albertsons had identified as the focus.

the vendor cash register." Finally, step (j) says to "repeat[] steps (f) through (i) for subsequent purchase transactions using [the same] User ID Barcode."

The claims' focus of setting up and using individual accounts for purchases is a "fundamental economic practice," *see W. Express*, 816 F. App'x at 486, similar to those that the Supreme Court and Federal Circuit have "already found to be directed to an abstract idea." *See Enfish*, 822 F.3d at 1334 (explaining that determining abstractness at *Alice* step one may be sufficiently done by comparison to previous cases). For example, in *Western Express*, the patent at issue described "the basic concept of a payment card." 816 F. App'x at 486.[5] The Federal Circuit held that the patent contained nothing beyond a 'fundamental economic practice long prevalent in our system of commerce.'" *Id.* at 487 (quoting *Alice*, 573 U.S. at 219). In so holding, the Federal Circuit rejected the plaintiff's arguments that its patent "solve[d] several problems associated with prior art money account cards," including "creating a bank account without an approval process" and "allowing the immediate purchase of goods." *Id.* Those purported "advantages" were "just the conventional benefits of a payment card." *Id.*

Here, like the "basic concept of a payment card" in *Western Express*, the '689 Patent's focus of setting up and using individual accounts for purchases is an abstract idea. Setting up the accounts in steps (a) through (e) is akin to the "basic concept of a payment card"—here, the "payment card" is instead an individual account at a store. Using the account for purchases in steps (f) through (j) builds on the same basic concept: once you have the individual account (or payment card), then you use it to make purchases. Nothing in the '689 Patent's focus goes beyond "the conventional benefits"

[5] The patent in *Western Express* also contained a funds-transfer step that is not relevant here.

of having an individual account for purchasing items at a store. *See id.* Thus, the focus of the '689 Patent is directed to an abstract idea.

Even without the direct analogy to *Western Express*, the Court could reach the same conclusion because the "innovative aspect of the claimed invention" is "entrepreneurial," not "technological." *See Solutran*, 931 F.3d at 1166 (citation omitted). In *Solutran*, the patent at issue involved "a system and method of electronically processing paper checks" that merely "recite[d] basic steps of electronic check processing." *Id.* at 1163, 1166. The patent's alleged innovation was in the ordering of the patent's steps, which taught crediting a merchant's account before scanning the check. *See id.* at 1167. Analogizing to previous Supreme Court case law, the Federal Circuit held that crediting the merchant's account earlier rather than later was an abstract idea. *See id.* (analogizing to *Bilski v. Kappos*, 561 U.S. 593 (2010), and *Alice*). The Federal Circuit rejected the notion that "the claims '[were] directed to a specific improvement to the way computers operate' and therefore not directed to an abstract idea." *Id.* (quoting *Enfish*, 822 F.3d at 1327). The claims "did not improve the technical capture of information from a check to create a digital file or the technical step of electronically crediting a bank account"; did not "improve how a check is scanned"; and were not "'limited to rules with specific characteristics' to create a technical effect." *Id.* (citations omitted). Involving no arguable technological improvement and reflecting only "[t]he desire to credit a merchant's account as soon as possible," the patent in *Solutran* was directed to a patent-ineligible abstract idea. *See id.*

Like the idea to credit a merchant's account sooner in *Solutran*, the idea to set up and use individual accounts here is entrepreneurial, not technological. It reflects a solution to the business issue of how a store's customers can pay for goods, not some purported improvement to the

technology used for payment. The nontechnological nature of the '689 Patent will become more apparent from the step-two analysis below, but for the purposes of *Alice* step one, the '689 Patent's focus is merely entrepreneurial. The '689 Patent is therefore directed to an abstract idea and fails *Alice* step one.

2. At *Alice* Step Two, the '689 Patent Contains No Inventive Concept to Transform the Claims Into Patentable Subject Matter.

To avoid dismissal at *Alice* step two, Wolverine raises two assertedly inventive features. First, Wolverine argues that the '689 Patent contains "the provision of enabling 'the user to automatically register with the [vendor's management server] without requiring the user to enter details of personal information upon the user's first use of the User ID Barcode for purchasing goods.'" Doc. 29, Resp., 8 (quoting '689 Patent at 4:29–33). Second, Wolverine argues that "security for the user's personal sensitive information is improved" through the '689 Patent's method. *Id.* (quoting '689 Patent at 5:66–67).

Neither of these assertedly inventive features save the '689 Patent. For starters, both features come from the specification, rather than the claims. "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp*, 855 F.3d at 1327 (first citing *Alice*, 573 U.S. 221; and then citing *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016)). A specification might shed light on why a concept from the claims is arguably inventive, but a specification cannot supply the inventive concept. Even if it could, the two assertedly inventive features raised by Wolverine do not "explain *how* the desired result is achieved" through some technological improvement. *See Elec. Power Grp.*, 830 F.3d at 1355. The '689 Patent does not teach *how* a user can automatically register with the vendor's management server on first use of her barcode. And the idea that the user does not need to provide personal information for her barcode

is not a technological improvement but just the abstract idea that the code used to individualize accounts can be based on non-personal information.

Even examining the '689 Patent's claims beyond what Wolverine has raised, no other technological concept recited therein—such as barcodes, scanners, or servers—is arguably inventive. A pertinent comparison is *Secured Mail Solutions*, where the Federal Circuit assessed seven patents that all "involve[d] methods whereby a sender affixes an identifier on the outer surface of a mail object (e.g. envelope or package) before the mail object is sent." 873 F.3d at 907. For all seven patents, "[c]omputers and networks are used to communicate the information about the mail object's contents and its sender after the mail object is delivered." *Id.* The Federal Circuit labeled one group of patents that "recite[d] a method for verifying the authenticity of the mail object" as "the Intelligent Mail Barcode patents." *Id.* In that group of patents, the "identifier" or "barcode" affixed to the mail object was "a single set of encoded data that is generated by concatenating a sender-assigned unique identifier with sender data, recipient data, and shipping method data." *Id.* That identifying barcode would also be stored in a database, which the recipient of the mail object could access to verify that the mail object she received was authentic. *Id.*

Having found that all seven patents' claims in *Secured Mail Solutions* "embrace[d] the abstract idea of using a marking affixed to the outside of a mail object to communicate information about the mail object," the Federal Circuit turned to *Alice* step two. *See id.* at 911. For the Intelligent Mail Barcode patents, the Federal Circuit assessed the elements of generating the identifier by "combining various pieces of data" and observed:

> The data need not even be in the form of a barcode, much less a specific new type of barcode. The claim language does not explain how the sender generates the information, only that the information itself is unique or new. The claim language

> does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it.

*Id.* at 911–12. With no arguably inventive concept to save the claims, the Federal Circuit affirmed the district court's decision to dismiss on a Rule 12(b)(6) motion. *See id.* at 912–13.

Here, as with the Intelligent Mail Barcode patents in *Secured Mail Solutions*, the '689 Patent's claims "do[] not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it." *See id.* at 912. The '689 Patent does limit itself to a barcode but not to "a specific new type of barcode." *See id.* at 911. The '689 Patent also does not explain the technical steps necessary to generate the barcode, scan it, process it, or communicate approval of the purchase. *See id.* at 911–12. And neither the '689 Patent's specification nor Wolverine's briefing asserts that the technology of barcodes, scanners, or servers were invented by the '689 Patent. Thus, although the '689 Patent invokes the use of technology, it does not contain an arguably inventive concept sufficient to save the claims at *Alice* step two. *See Elec. Power Grp.*, 830 F.3d at 1355 ("We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." (citations omitted)).

Zooming out to the ordered combination of the claim elements, the '689 Patent still lacks an arguably inventive concept. *See Alice*, 573 U.S. at 217 (prescribing consideration of claims "as an ordered combination" at step two (citation omitted)). An inventive concept can exist "in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. But the logical ordering of first setting up individual customer accounts and then allowing their use for purchases is not an arguably inventive way of using known technology, and Wolverine makes no argument to the contrary.

Finally, Wolverine argues that the ’689 Patent solves “a specific problem arising in electronic commerce.” Doc. 29, Resp., 8–10. In support, Wolverine attempts to analogize to *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, Nos. 14-732-RGA–14-737-RGA, 2015 WL 1744343 (D. Del. 2015). *See id.* That case involved a patent “directed to a problem unique to text-message telecommunication between a mobile device and a computer.” *Messaging Gateway Sols.*, 2015 WL 1744343, at *5. Addressing a limitation in conventional technology where “phones could not send SMS text messages to computers,” the patent in *Messaging Gateway Solutions* provided a solution “tethered to the technology that created the problem.” *Id.* The patent’s solution specified how the interaction between a phone and computer could be manipulated so that the phone could send a message in its language (SMS text) that could then be received and understood by the computer in its language (Internet Protocol message). *See id.* at *2–3, *5. Thus, the patent in *Messaging Gateway Solutions* was patent-eligible because it was “firmly rooted in technology” and “addressed . . . a specific problem arising in the realm of mobile device-to-Internet communication.” *Id.* at *6.

Wolverine’s attempted analogy to *Messaging Gateway Solutions* does not make sense. The ’689 Patent does not address a specific technological problem like the phone-to-computer communication problem addressed in the patent in *Messaging Gateway Solutions*. Instead, the ’689 Patent addresses the business problem of finding another way for customers to pay.

Wolverine seems to think of “e-commerce” as a technological realm and argues that the ’689 Patent’s method of setting up individual accounts and allowing their use was “not possible prior to the claimed invention.” *See* Doc. 29, Resp., 8 (citing ’689 Patent at 3:40–67). But e-commerce is not a technological realm. It is a commercial one. And, most importantly, the ’689 Patent does not even arguably introduce any new technology to that commercial realm. The ’689 Patent might introduce

a new method for doing commerce, but that method, as explained above, is no more than the abstract idea of setting up and allowing the use of individual store accounts. Even if no one before thought of that method, "a claim for a *new* abstract idea is still an abstract idea." *Synopsys*, 839 F.3d at 1151.

When the "alleged 'inventive concept' that solves problems identified in the field" is the "abstract idea itself," there is no inventive concept sufficient to save the patent at *Alice* step two. *See ChargePoint*, 920 F.3d at 774. With nothing in the '689 Patent's claims besides the abstract idea of setting up and allowing the use of individual store accounts, the '689 Patent is ineligible for patent protection.

C. *Leave to Amend Would be Futile.*

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015) (citations omitted). "Denial of leave to amend is appropriate where there is no indication that amendment would cure the defects in a complaint." *Id.* "No amendment to a complaint can alter what a patent itself states." *Sanderling Mgmt. Ltd v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023). The Court has scrutinized the '689 Patent and Wolverine's allegations and arguments for anything that might save the '689 Patent from ineligibility. Finding nothing, the Court concludes that the '689 Patent is ineligible for patent protection, and allowing Wolverine another chance at pleading would be futile.

## IV.

## CONCLUSION

Albertsons's Motion to Dismiss (Doc. 24) is **GRANTED** because the '689 Patent claims a patent-ineligible abstract idea, and the case is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

**SO ORDERED.**

**SIGNED: July 9, 2026.**

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE

# EXHIBIT A

US009280689B2

(12) **United States Patent**
Ling

(10) **Patent No.: US 9,280,689 B2**
(45) **Date of Patent: Mar. 8, 2016**

(54) **METHOD AND APPARATUS FOR CONDUCTING OFFLINE COMMERCE TRANSACTIONS**

(76) Inventor: **Marvin T. Ling**, Scottsdale, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 101 days.

(21) Appl. No.: **13/816,955**

(22) PCT Filed: **Aug. 16, 2011**

(86) PCT No.: **PCT/US2011/047862**

§ 371 (c)(1), (2), (4) Date: **Feb. 14, 2013**

(87) PCT Pub. No.: **WO2012/039859**

PCT Pub. Date: **Mar. 29, 2012**

(65) **Prior Publication Data**

US 2013/0140361 A1 Jun. 6, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/385,022, filed on Sep. 21, 2010.

(51) **Int. Cl.**

***G06K 5/00*** (2006.01)
***G06K 15/00*** (2006.01)
***G06Q 20/32*** (2012.01)
***G06K 19/06*** (2006.01)
***G06K 19/14*** (2006.01)

(52) **U.S. Cl.**

CPC ............ ***G06K 5/00*** (2013.01); ***G06K 19/06028*** (2013.01); ***G06K 19/14*** (2013.01); ***G06Q 20/3274*** (2013.01)

(58) **Field of Classification Search**

USPC ............ 235/375, 380, 449, 472.01, 492, 493, 235/383, 385, 451

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,146,344 B2 12/2006 Wankmueller
7,249,060 B2 7/2007 Ling
7,258,266 B1 8/2007 Bowe, Jr.
7,359,880 B2 4/2008 Abel et al.
7,676,432 B2 3/2010 Ling
2002/0111907 A1 * 8/2002 Ling .............................. 705/41
2008/0103984 A1 * 5/2008 Choe et al. ...................... 705/76
2008/0210754 A1 9/2008 Lovett
2008/0222048 A1 * 9/2008 Higgins ................ G06Q 20/12 705/67
2009/0281904 A1 * 11/2009 Pharris ........................... 705/17
2010/0138344 A1 6/2010 Wong
2012/0054046 A1 * 3/2012 Albisu ........................... 705/16
2013/0087612 A1 * 4/2013 Locher ......................... 235/380

* cited by examiner

*Primary Examiner* — Tuyen K Vo
(74) *Attorney, Agent, or Firm* — Cahill Glazer PLC

(57) **ABSTRACT**

Methods and apparatus for conducting offline commerce transactions that use a barcode as an alternative means for personal identification. The user represented in the bar code format, User ID Barcode, is generated from a number that uniquely identifies the user. Numbers such as a cell phone number or a credit card number may be used to generate the User ID Barcode. These numbers are prefixed with a special character before they are converted to the barcode format. Prefixing a special character is necessary so that the bar code generated can be distinguished from any bar code representing products being sold. If a credit card number is used, the User ID Barcode is printed on the back of the credit card which then becomes a 2 and 1 credit card.

**3 Claims, 16 Drawing Sheets**






PRIOR ART

FIG. 1(a)


50
Display
6
14
60
40
3
13
5
30
Vendor Server
4
9
Cash Register
Sales Slip
80
10
UVM Server
11
12
8
2
20
Barcode Scanner Reader
70
7
1
10
User ID Barcode (Cell Phone or Card)
Product Barcode

FIG. 1(b)




PRIOR ART

FIG. 2(a)


Vendor Server
UVM Server
Customer
1
Vendor
2
Detect
User ID Barcode
Yes
5
User Account
(Debit)
6
3
No
4
Product Description
Vendor Account
7

FIG. 2(b)


310
User ID Barcode
(Cell phone or Credit card)
320
Barcode Scanner
330
340
350
INTERNET
Dedicated phone
line connection
Wireless phone connection
360
UVM
PROCESSOR
NETWORK
INTERFACE
STORAGE
MEMORY
Cell phone loaded with the User ID Barcode
Credit card printed with the User ID Barcode

FIG. 3




PRIOR ART

FIG. 4(a)


450
UVM
460
Web server
465
Web pages
470
Web engine
480
485
User Database
490
User acct number
User transaction records
495
Product database
496
Vendor acct record
Vendor product sold records

FIG. 4 (b)


500
Start
501
Pre-Paid Mode?
N
Y
502
Describe registration policy, the need to open an account, the need to make initial minimum deposit to the account (Top Off amount) and other information
503
Describe registration policy, the need to open an account, initial maximum credit limit (Negative Top Off amount) and other information
504
O.K.?
N
505
Exit
Y
506
Obtain personal information:
1. Name, address, phone number, e-mail address
2. User ID and Password
3. Credit card or Bank account information
4. User's cell phone number
5. PIN number and other information
535
Exit
507
Agree upon payment method: credit card, bank account, or others
N
511
510
Continue
Y
User provide other payment method
509
Request to use other payment method
N
Payment method O.K.?
508
Y
512
1

Fig. 5(a)


512
1
513
Create and assign a user account number corresponds to the user's cell phone number or credit card number (non-active)
514
Inform user the account number (non-active)
515
Pre-Paid Mode?
N
Y
516
Minimum amount of deposit (MT) Set MT=Top Off amount
530
Set credit limit (CL) CL=Negative Top Off amount
517
User made initial minimum amount of deposit. Make user's UVM account number active.
531
Add user database entry
518
Add user database entry
532
Set user's available credit limit (AC) AC=CL
519
Set user's available amount of fund AT=MT
520
Create User ID Barcode using user's cell phone number or credit card number
521
Send the user a 2 in 1 new credit card with User ID Barcode printed in the back of the card or download the User ID Barcode to the user's cell phone
522
Inform user that the UVM account is active and the User ID Barcode is ready for making purchases for goods in micropayment level and non-micropayment level
535
Exit

Fig. 5(b)




AT= Available amount of fund

MT= Initial minimum amount of deposit (Top Off amount)

CG= Cost of goods purchased

AS= Amount of fund short to make the purchase

NT= Amount of new deposit

AT=AT - CG

If AT ≤ 0 then AS= - (AT - CG)

NT=AS+MT

FIG. 6 (a)




AC=Available credit limit amount

MT=Initial maximum credit limit allowed (Negative Top Off amount)

CG =Cost of good

AS=Amount of credit limit short to make the purchase

PA=Payment amount

AC = AC - CG

If AC $\leq$ 0 then AS= - (AC - CG)

PA = AS + MT

FIG. 6 (b)


700
Start
701
User goes to a store
702
User selects an item(s) to purchase
703
User makes payment to store cashier
704
Payment using user's cell phone or credit card with the User ID Barcode?
N
708
Makes payment using other method
709
Exit
Y
705
Capture User ID Barcode using the barcode scanner at the cash register
706
Access user account
707
Pre-Paid Mode?
N
750
2
Y
710
1

Fig. 7(a)


710
Pre-paid Mode
1
711
CG ≤ AT?
Y
N
712
AT=AT - CG
713
Exit
719
Transaction canceled
N
714
User deposits additional fund in the account?
720
Exit
715
Y
Amount of shortage = AS
AS = - (AT - CG)
716
Amount of new deposit = NT
NT=AS + MT
717
AT=NT - AS=MT
718
Exit

Fig. 7(b)


750
Pre-paid Mode
2
751
CG ≤ AC?
Y
N
752
AC = AC - CG
753
Exit
754
User makes payment ?
N
759
Transaction canceled
760
Exit
Y
755
Amount of credit shortage = AS
AS = - (AC - CG)
756
Payment amount, PA
PA = AS + MT
757
AC = PA - AS = MT
758
Exit

Fig. 7(c)


BRIDGE
(4)
(6)
(7)
(3)
UVM1
UVM2
Vendor
(5)
(2)
(8)
#1
#2
#10
#11
Barcode Scanner
Barcode Scanner
Barcode Scanner
Barcode Scanner
(1)
User1
(9)

FIG. 8


SUPER BRIDGE
(5)
(9)
(10)
(4)
BRIDGE (A)
BRIDGE (B)
(6)
(8)
(11)
(3)
UVM (A)
UVM (A)
(7)
(12)
(2)
(1)
User 1
Vendor
(13)

FIG. 9

# METHOD AND APPARATUS FOR CONDUCTING OFFLINE COMMERCE TRANSACTIONS

## RELATED APPLICATIONS

This application is related to and claims priority to a provisional application entitled "METHOD AND APPARATUS FOR CONDUCTING OFF LINE COMMERCE TRANSACTIONS USING A BAR CODE GENERATED FROM A CELL PHONE NUMBER AS AN ALTERNATIVE MEANS TO A CREDIT CARD WITH ENHANCED SECURITY" filed Sep. 21, 2010, and assigned Ser. No. 61/385,022.

## FIELD OF THE INVENTION

The present invention relates to methods and apparatus for conducting offline commerce transactions using the user ID Barcode as the user identifier for purchasing goods priced at micro payment or non-micro payment level using the fund or credit limit available at the user's account in the server identified as a User Vendor Management Server (UVM).

## BACKGROUND OF THE INVENTION

Users currently pay for goods priced in micro payment levels, such as five cents or ten cents using cash. Such payments are not made with credit cards because the cost of the credit card transaction processing is too high, making it impractical both for vendors and credit card companies to accept the use of a credit card for micro payment purchases.

The cell phone imbedded with a RFID (Radio Frequency Identification) tag or NFC chip (Near Field Communication Chip) allows loading of the tag or chip with cash using a special machine which then allows the payment of goods in micro payment levels or non-micro payment levels. A non-contact RFID tag or NFC reader is required to subtract the amount of the transaction from the cash available in RFID tag or NFC chip and record the transaction data. Cell phones are presently being offered with imbedded NFC chips. This fact indicates companies are capturing micro payment transaction market currently being made in cash and ignored by credit card companies.

These payment methods require the user to load the cell phone with money using a special machine available only at banks or limited places. Also, a non-contact card reader is required at the vendor site to read and subtract the purchasing amount from the amount of money within the user's cell phone. Very few vendors have a non-contact card reader. Therefore these payment methods are inconvenient for users. Furthermore, if the user loses the cell phone, it is the same as losing cash.

Japan Railway issues SUICA cards and subway systems issue PASMO cards both of which have built-in IC chips. SUICA and PASMO cards allows passengers to enter and exit train stations very quickly simply by flashing remotely their SUICA or PASMO card at the non-contact card readers installed at the gate. There are some vendors inside and near JR and subway stations that have non-contact card readers, allowing users to purchase low cost items such as a bottle of water, gum or a magazine, etc. It is said that there are about 20,000 non-contact card readers in Japan. Most of these card readers are used by Japan Railway and subway systems for reading train tickets. There are over 800,000 regular card readers for conventional credit cards in vendor sites across the entire Japan. However, all vendors worldwide have barcode scanners with cash registers. While it appears that the application for RFID or NFC technologies are very convenient, they are best suited for transportation but not suited for purchasing transactions.



SUICA card issued by Japan Railway (JR) loaded with pre-paid amount of money are used by over 10 millions of users for train tickets and purchases of low cost goods at participating vendors near JR stations in Japan. SUICA card requires a special non-contact card reader therefore the use of SUICA card is limited to vendors having a non-contact card reader. Similarly, PASMO card issued by subway systems companies for purchasing subway train tickets and purchasing low cost goods at participating vendors near subway stations in Japan also are being used by millions of users. PASMO card also uses a non-contact card reader. Edy card issued by SONY Corporation for purchasing goods requires the payment of subscription fee and service charges are relatively high. Edy card also requires loading of cash and requires a non-contact card reader.

JCB, the largest credit card company in Japan issued QUICPay card for micro payments. QUICPAY is a post pay card like a conventional credit card. QUICPay card also requires non-contact card reader. SUICA card, PASMO card, Edy card and QUIC Pay card do allow payment of purchases priced at micro payment level. SUICA card, PASMO card and Edy card has the disadvantage in that if the card is lost, the remaining money in the card is lost. SUICA card, PASMO card, Edy card and QUICPay card can be used only at vendors having the special non-contact card reader and they are used only within Japan since the special non-contact card reader are rarely available outside of Japan.

## SUMMARY OF THE INVENTION

The present invention introduces a new method for identifying a user using the User ID Barcode, allowing the user to charge purchasing of goods priced in micro payment level or non-micro payment level either offline or online at a participating vendor site.

The user ID Barcode converts a unique number such as the cell phone number or the credit card number prefixed with a special character like "?" into the barcode format. The User ID Barcode can be downloaded into the user's cell phone and displayed in the cell phone window or printed in the back of the user's credit card to become a 2 in 1 credit card. Alternatively, the barcode may be printed on a sticker or label secured to a carrying member such as the cell phone or credit card. One of several means to capture the User ID Barcode in the present invention is to allow the cashier to use a barcode scanner available at the cash register. It is to be noted that practically all store cash registers worldwide are equipped with barcode scanners.

If the cell phone number is used to generate the User ID Barcode and it is downloaded in the cell phone, or is printed on a label secured to the cell phone, the cell phone can be used to make purchases of goods from participating vendors. The cashier captures the User ID Barcode using the barcode scanner available with the cash register. The cell phone acts like a credit card in this case.

If the User ID Barcode is generated using the credit card number and printed on the back of a regular credit card or on a label secured to the credit card, the card becomes a 2 in 1 credit card. For goods priced in micro payment level, the barcode scanner is used to capture the User ID Barcode. For goods priced in non-micro payment level, the conventional credit card reader is used to capture the credit card number.

The present system and method uses the cell phone numbers or the credit card number to identify the user who makes

purchases of goods at participating vendor sites. Other identifiers such as the driving license number or the social security number etc. may also be used.

There are other methods to capture the user's cell phone number or credit card number. These may include the use of Radio Frequency Identification (RFID) or Near Filed Communication (NFC) technologies. A RFID tag or a NFC is attached on the back of the cell phone or built in the logic card inside the cell phone. Or a card with built in RFID tag or NFC chip may also be issued. The cash register in the vendor site will have a RFID or NFC reader to read the cell phone number or credit card number. Alternatively, the cashier may capture the user ID using the keyboard at the cash register.

The cell phone number or the credit card number is prefixed with a special character such as "?" before they are converted into the barcode format to become the User ID Barcode. The special character as a prefix or suffix or both as the beginning and the ending character is required so that the system can distinguish the User ID Barcode from the product data barcode within the data captured by the barcode scanner.

The User ID Barcode is encrypted for security. The encryption algorithm can be changed with time to provide additional level of security for the user. Therefore the encryption algorithm is "time variant". The encryption algorithm for the User ID Barcode can be different for the different users. Therefore the encryption algorithm is also "user variant". For increased security for the users, the User ID Barcode may be encrypted using both the time variant and the user variant encryptions algorithms.

The present method and system introduces a server called User Vendor Management Server (UVM) for the management of users and vendors. The UVM processes all purchasing transactions between the user and the vendor. The UVM may be operated in a prepaid mode or a post pay mode. For the prepaid mode, the user registers with the UVM and creates an account. The user deposits a certain amount of funds as required by the operator of the UVM, using his credit card or the bank account. This amount is called the Top Off amount. The payment for the purchase transaction is made from the fund available within the user's UVM account. When the fund available in the user's UVM account is not enough to cover the cost of the purchase, the method and apparatus of the present invention provides an easy and fast method for the user to add to the fund instantly to the user's UVM account. The amount to be added to the user's UVM account, using the credit card or the bank account is the shortage of the cost of the purchase plus the Top Off amount such that the available fund in the user's UVM account after the completion of the purchase is restored to the Top Off amount.

In the post pay mode, the user registers at the UVM and creates an account. The UVM provides the user's UVM account a certain available credit limit as pre-determined by the UVM operator. This amount is called the Negative Top Off amount. The payment for the purchase transaction is made from the available credit limit of the user's UVM account. When the cumulative purchase amount reaches or exceeds the available credit limit, the present invention charges the user's credit card or the bank account provided by the user at the time of registration, the amount so that the user can make the purchase and bring the user's UVM account balance to zero and restore the user's available credit limit to the Negative Top Off amount.

This automatic Top Off instant add fund method in the pre-paid mode and automatic Negative Top Off instant charge to the user's credit card or the bank account in the post pay mode avoids the user or cashier otherwise having to manually



enter the payment amount and therefore it provides convenience and speedy payment process.

The present invention provides fast checkout at the vendor cashier without the need to sign the sales receipt or enter PIN thus provide convenience to the user and reduces the vendor operation cost. Further, the present invention allows the user to set spending thresholds either per purchase, per day, per week or per month.

The UVM may send a e-mail to the user for each and every purchase that the user made using the User ID Barcode, indicating the vendor name, the amount of purchases and the time and the date that the purchasing transaction has taken place. The user may check the daily transaction records by logging into the UVM transaction record pages, allowing the user to manage the account and discover early any unauthorized use of the user's account.

The present invention also provides the user a means for security and minimizes the loss allowing the user to invalidate the User ID Barcode and change the password to lock the UVM account prior to informing the UVM operator upon discovery of unauthorized use of the user's account, or in case the user looses the cell phone with the User ID Barcode being loaded inside, or a 2 in 1 credit card or the user account password is stolen, thus minimizing potential damages.

The present invention protects the user's privacy when the user makes purchases of goods either offline or online using the User ID Barcode without the need to provide each vendor the user's personal information.

The present invention allows the user to automatically register with the UVM without requiring the user to enter details of personal information, upon the user's first use of the User ID Barcode for purchasing goods. The UVM server computer may obtain user's personal information from the cell phone company's computer database or credit card company's computer database thus providing convenience to the user. Similarly, the present invention allows the vendor to automatically register with the UVM as a participating vendor, when the vendor accepts for the first time, payment of purchases from the user using the User ID Barcode. The UVM operator may contact the vendor to obtain detail vendor information at a later time and establish payment thresholds either by the amount or by the time.

In the present invention, the UVM processes the purchasing transaction without involving any third party therefore minimizing the cost of processing each purchase transaction.

The present system makes payment using the UVM account for purchasing goods priced at micro payment level or non micro payment level. Since the fund available in the user's UVM account is loaded using the user's credit card, the user will accumulate points offered by credit card companies for all purchases including purchases of low cost goods such as five cents, ten cents or few dollars in micro payment level. This is an advantage for the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects and advantages of the present invention will be apparent upon consideration of the following detailed description taken in conjunction with the accompanying drawings, in which like characters refer to like parts throughout and in which:

FIG. **1**(*a*) is an overview of the conventional credit card purchasing transaction processing;

FIG. **1**(*b*) is an overview of the purchasing transaction of the method and apparatus of the present invention using the User ID Barcode, downloaded into a cell phone or printed on the back of a credit card;

FIG. **2**(*a*) describes conventional credit card transaction processing;

FIG. **2**(*b*) describes the transaction processing of the present invention using the User ID Barcode;

FIG. **3** is an overview of the net worked environment in which the present technology is used;

FIG. **4**(*a*) is a diagram of the technology executing on a server of the card processing company;

FIG. **4**(*b*) is a diagram of the technology executing on a server built in accordance with the principles of the present invention;

FIGS. **5**(*a*) and **5**(*b*) describe the user registration process at the UVM;

FIG. **6**(*a*) shows the user UVM account balance after each purchasing transaction in a pre-paid mode;

FIG. **6**(*b*) shows the user UVM account balance after each purchasing transaction in a post pay mode;

FIG. **7**(*a*) shows the purchasing process;

FIG. **7**(*b*) shows the purchasing process in a pre-paid mode;

FIG. **7**(*c*) shows the purchasing process in a post pay mode;

FIG. **8** describes the purchasing logics when a user registered at a UVM makes purchases at a vendor of another UVM; and

FIG. **9** is an example of the logic when a user makes purchases at a vendor of a different currency for international commerce transactions.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention provides a method and system for conducting business commerce transactions in an offline environment using the User ID Barcode as an identifier for the user. A barcode, as used herein, refers to the typical optical machine-readable representation of data. The code usually identifies data concerning the object to which it is attached and is represented by varying widths and spacings of parallel lines. The data contained in the barcode is read by conventional barcode readers or scanners that optically recognize the spacings and widths of the parallel lines to derive data concerning the article to which the code is attached. The User ID Barcode is derived from the conventional barcode and includes a special character, or characters, to identify it as a personal ID code and to distinguish it from barcodes that may incorporate data relating to products or goods. The User ID Barcode can be generated from the cell phone number and downloaded into a cell phone or generated from the credit card number and printed on the back of the regular credit card, or on labels secured to the credit card, as examples.

When the User ID Barcode generated from the cell phone number is downloaded into a cell phone, the cell phone is used as an alternative means for a credit card for the payment of purchasing goods in micro payment level as well as non-micro payment level. The cashier captures the cell phone number represented in the barcode for the user identification, much the same as capturing the credit card number for the user identification. While capturing the credit card number usually uses the card reader to read the credit card number and other information written in the magnetic stripe in the back of the credit card, capturing of the cell phone number represented in the barcode needs to use other methods. One such method is to use the barcode scanner available at the vendor cash register.

When the barcode scanner is used to capture the cell phone number, it is desirable that the cell phone number is represented in the barcode format and that the cell phone number is provided with a prefix or suffix or both in the form of a special character before converting it to the barcode format to become the User ID Barcode so that the Vendor Server can distinguish the barcode representing the description and price of the goods from the barcode representing the cell phone number. To make the capturing of the cell phone number easier, it is desirable, for example, that the User ID Barcode is downloaded to the user's cell phone and displayed at the cell phone window or on a label secured to the cell phone. Alternatively, a credit card number provided with a prefix or suffix or both in the form of a special character such as "?" can be converted to a barcode format to become a User ID Barcode and printed on the back of the credit card. This card becomes the 2 in 1 credit card that can be issued for users.

The "2 in 1 card" can be used for charging purchase of goods priced in both micro payment and non-micro payment levels. For payment of regularly priced goods, the cashier swipes the credit card at the credit card reader. For payment of low cost item in micro payment level, the cashier captures the Used ID Barcode using the barcode scanner.

The User ID Barcode is encrypted for security. The encryption algorithm can be changed with time to provide additional level of security for the user. Therefore the encryption algorithm is "time variant". The encryption algorithm for the User ID Barcode can be different for the different users. Therefore the encryption algorithm is also "user variant". For increased security for the users, the User ID Barcode may be encrypted using both the time variant and the user variant encryptions algorithms.

The capturing of the user identification number may be accomplished by using other techniques such as RFID or NFC instead of the barcode scanner. Keying the user identification number may also be used. While the user's cell phone number or credit card number is used for the identification of the user in the present invention, other means for the user identification, for example, user driver's license number or user's social security number may also be used as the user identification for the present invention. Each of these other identifiers are provided with a special character for conversion into the barcode format to become the User ID Barcode.

Conventional credit cards allow users to purchase goods having a value above a certain minimum. The minimum may be, for example, one or two dollars or more. Charges below this minimum are usually cost prohibitive for the transaction processing; the vendor would prefer customers to pay for such purchases in cash. The cost of the credit card transaction processing includes a fixed amount that usually is set at approximately 35 cents per transaction plus a certain percentage of the amount of the transaction. This means that any purchase of goods costing in the micro payment level will need to be made by some other method such as a debit card or cash. While debit cards allow payment of purchases in the micro payment level, using a debit card often requires entering of a PIN, and/or the signature on a sales receipt. Payments made in cash require the user to carry cash, and preferably in small denominations, so that the payment can easily be made. Otherwise, the cashier needs to count the money and provide change. Both payment methods take time and slow the completion of the purchasing transaction.

The present method and system uses the User ID Barcode for personal identification. When the User ID Barcode is downloaded into the user's cell phone, the cell phone can be used to make purchases of goods similar to a conventional credit card except the use of User ID Barcode allows the user to charge goods, costing in the micro payment level in addition to purchase of normal price range products. The conventional credit card typically does not allow charging goods costing in micro payment levels. Furthermore, the User ID

Barcode, being captured by the cashier using the scanner available at the cash register, provides fast checkout and with limited cost to the vendor for the transaction processing. Note that vendors worldwide have barcode scanners. Vendors will be required to install RFID or NFC chip reader as new investments if the system uses RFID or NFC technology.

For purchasing of goods costing in micro payment level, the present system captures the User ID Barcode using the barcode scanner available at the cash register. The system and method of the present invention provides the user with fast checkout at the cashier without having to sign the sales slip or to enter PIN. This results in fast checkout with the cashier and it provides user convenience and potentially reduces the number of cashiers and therefore reduces the vendor's operation cost. Some vendors may prefer cash transactions from cash flow point of views and avoid payments of service charges required from credit card companies but vendors, such as convenience stores that remain open until late in the night may become the target of potential robbery if the stores have too much cash in their cash registers.

The present method and system introduces a server called User Vendor Management Server (UVM) for the management of users and vendors. The UVM processes all purchasing transactions between the user and the vendor. The UVM may be operated in a prepaid mode or a post pay mode. For the prepaid mode, the user registers with the UVM and creates an account. The user deposits funds as required by the operator of the UVM, using a credit card or the bank account. This amount deposited is called the Top Off amount. The payment for the purchase transaction is made from the fund available within the user's UVM account. When the fund available in the user's UVM account is not enough to cover the cost of the purchase, the method and apparatus of the present invention provides an easy and fast method for the user to add funds instantly to the user's UVM account by using the credit card or the bank account that the user provided at the time of registration. The amount to be added is the shortage of the cost of the purchase plus the Top Off amount such that the available fund in the user's UVM account after the completion of the purchase is restored to the Top Off amount.

In the post pay mode, the user registers at the UVM and creates an account. The UVM provides the user's UVM account a certain amount of available credit as pre-determined by the UVM operator. This amount is called the Negative Top Off amount. The payment for the purchase transaction is made from the available credit limit of the user's UVM account. When the cumulative purchase amount reaches or is to exceed the available credit limit, the present invention charges the user's credit card or the bank account provided by the user at the time of registration, an amount so that the user can make the purchase and bring the user's UVM account balance to zero and restore the user's available credit limit to the Negative Top Off amount.

This automatic Top Off instant add fund method in the pre-paid mode and automatic Negative Top Off instant charge to the user's credit card or the bank account in the post pay mode avoids the need for the user or cashier to manually enter the payment amount and therefore provides convenience and speedy payment.

Because the cost of the purchases are paid for using the user's UVM account of the present system and method without having a third party involved, the checkout process is very fast and allows the vendor to reduce overhead cost. The UVM operator will settle with each vendor upon reaching a pre agreed thresholds either by amount or by time.

For user's security, the present system permits the user to set spending thresholds by the amount per purchase, per day, per week and per month to reduce the risk. The system automatically sends e-mail to the user when there is any activity in the user's account. The user may also check the daily transaction records by log-in to the UVM and access transaction record pages. Both features allow the user to discover early any unauthorized use of the user's account.

The present system also provides users an additional means for security and minimizes losses by allowing the user to lock the account upon discovery of unauthorized use of the user's account or in case the user loses the cell phone loaded with the User ID Barcode or 2 in 1 credit card printed with the User ID Barcode or the user's account password is stolen.

The present system provides user privacy. When the user purchases goods either on line or offline using the User ID Barcode loaded in a cell phone as an alternative to a conventional credit card or 2 in 1 credit card printed with the User ID Barcode, the system does not require the user to register with the vendor or provide any user's personal information to the vendor. Another important feature of the present system relates to protection of privacy. The user usually records the telephone number of friends that they call often on the cell phone. Upon receiving report of the loss of the cell phone from the user, the UVM may erase everything recorded in the cell phone including the User ID Barcode as soon as the cell phone power is turned on.

One of many incentives each credit card company offers to users is to award each user incentive points proportional to the amount of charges for purchases. However, the user usually does not receive any incentive if the purchase of goods is priced at the micro payment level and the user pays for the purchase by cash. The present system provides the user incentive points even for micro payment purchases because payments for micro payment purchases are made using the fund or available credit limit in the user's UVM account and the loading of funds into the user's UVM account or payment of available credit limit for the user's UVM account is made using the user's credit card. Therefore, the present system provides the user incentive points for each and every purchase regardless of the amount of the purchasing transaction that the user makes.

The present system and method introduces an automatic registration process in which the cell phone holder will automatically be registered with the micro payment transaction server computer such as the UVM as described, upon the first use of the User ID Barcode loaded in the cell phone or 2 in 1 credit card printed with the User ID Barcode for purchasing low cost items at a participating vendor. The UVM may request the user personal information from the cell phone company's database or the credit card company's database so as to avoid the user to re enter user's detail personal information repeatedly thus the automatic registration process provides convenience to the user. In this automatic registration process, the user will be asked to provide User ID and Password at a later time.

The present system and method also introduces an automatic registration process for a vendor when the vendor accepted for the first time the user to pay for the goods the user is purchasing using the User ID Barcode. The UVM operator may obtain more detail vendor information at a later time including establishing an agreement for the settlement thresholds either by time or by the amount.

There are many pre-paid cards or IC cards available in the market. The pre-paid card does allow the user to pay for transaction amount in micro payment levels. However, the user is required to purchase a new pre-paid card when the remaining amount of cash in the pre-paid card runs out or becomes too small to make the purchase. This is inconvenient

for the user. The pre-paid card issuers offer some incentives that sometime attract users. Since pre-paid cards can be used only at the vendor sites specified by the pre-paid card issuer, a user may end up having several pre-paid cards. If a user looses the pre-paid card, the remaining amount of money in the card is lost.

The present method and system uses the User ID Barcode for personal identification. When the User ID Barcode is downloaded into the user's cell phone, the cell phone can be used to make purchases of goods similar to a conventional credit card except the use of User ID Barcode allows the user to charge goods, costing in micro payment level in addition to purchase of normal price range products whereas a conventional credit card usually does not allow charging goods costing in micro payment levels. Furthermore, the User ID Barcode, being captured by the cashier using the scanner available at the cash register, provides fast checkout and with limited cost to the vendor for the transaction processing.

Referring to FIG. **1**(*a*), a conventional credit card transaction processing is shown. The barcodes for products being purchased are captured using a Barcode Scanner **10** available at the vendor Cash Register **20** as shown in step **1**. The description of the product such as product name and the price is shown at the cash register Display **30**, step **2**. When all purchased products are entered at the Cash Register **20**, the user is asked to swipe the credit card at the Credit Card Reader **40** attached to the Cash Register **20**, as shown in step **3**. The transaction data, which includes the vendor ID, the product description, the total purchasing amount, the user credit card number and others information are transmitted to the Card Transaction Processing Center **50**, as shown in step **4**. The Card Transaction Processing Center **50** authenticates the card to detect such problems as a fake card or an invalid card and then transmits the transaction data to the Credit Card Company **60** as shown in step **5**. The Credit Card Company then checks to see if the owner of the credit card has good credit rating and if so, it checks to see if the total amount to charge for the purchase or other transaction is within the credit limit given to the user.

Upon satisfying these and other conditions, the Credit Card Company **60** sends the approval signal back to the Card Transaction Processing Center **50** as shown in step **6**. The Card Transaction Processing Center **50** in turns sends the approval signal back to the Credit Card Reader **40** as shown in step **7**. The user signs at the Credit Card Reader display **70**, step **8**. The final approval signal is than sent to the Cash Register Display **30**, step **9** and it prints out the Sales Slip **80** as shown in step **10** and that completes the purchasing transaction. If either Card Transaction Processing Center **50** or the Credit Card Company **60** does not approve the transaction, the rejection signal is sent to the cash register Display **30** and the transaction is canceled.

FIG. **1**(*b*) describes the purchasing transaction processes using the User ID Barcode loaded in a cell phone or printed on a credit card. The user's cell phone number prefixed with a special character or the user's credit card number prefixed with a special character is converted into a barcode format to become the User ID Barcode for personal identification. Prefixing, attaching, or both, a special character to the cell phone number or the credit card number then converting it to the barcode format as the User ID Barcode is necessary in order for the vendor server to distinguish the User ID Barcode from the product barcode. The product barcode **10** being purchased is captured using a Barcode Scanner Reader **20**, step **1**, and it is sent, step **2**, through Cash Register **30** to the Vendor Server **40**, step **3**. The Vendor Server **40** sends the description of the product including the price back to the Cash Register **30**, step **4** and it is displayed at the cash register Display **50**, step **5** and it is printed in the Sales Slip **60**, as shown in step **6**. When all purchased products are entered at the Cash Register **30**, the user is asked to make the payment. The user shows the User ID Barcode as displayed in the cell phone or printed on the back of the credit card to the cashier. The cashier captures the User ID Barcode **70**, using the Barcode Scanner Reader **20**, step **7**.

The Barcode Scanner sends the User ID Barcode it captured to Cash Register **30**, step **8**, and the Cash Register **30** sends the transaction data which includes the vendor ID, the product description, the total purchasing amount, the User ID Barcode and others information to the Vendor Server **40**, step **9**. The Vendor Server **40** detected the special character in the User ID Barcode indicating that the barcode does not represent any products for sale and it is the User ID Barcode, the Vendor Server **40** sends the User ID Barcode together with the transaction data to the UVM Server **80**, step **10**.

The UVM Server **80** access the user's UVM account and checks to see if the user has enough funds or available credit limit in the user's UVM account. If yes, the UVM Server **80** subtracts the cost of the good from user's UVM account and sends the approved signal back through the Vendor Server **40**, step **11**, to the Cash Register **30**, step **12**. The Cash Register **30** displays the approved signal, step **13** and prints out the Sales Slip **60** as shown in step **14**. This completes the purchasing transaction. If the user does not have enough funds or available credit limit in the user's UVM account or there is any problem with the user's UVM account, the UVM server **40** sends the rejection signal to the cash register display **30** and the transaction is cancelled.

It is to be noted that other methods such as Radio Frequency Identification (RFID) or Near Field Communication (NFC) technology may be used to capture user's identification number but such techniques require the purchase and use of an RFID or NFC reader. The present invention permits the use of existing barcode readers that are already present in commercial establishment. Also, other sources for the user identification such as driving license number or social security number, converted into barcode format, may be used to identify the user instead of the user's cell phone number or credit card number as described herein.

FIG. **2**(*a*) describes the conventional credit card transaction processing in more detail. The Customer purchases goods at a Vendor and swipes the credit card, as shown in step **1**. The Vendor sends the transaction data including the vendor ID, the purchased product description, total purchasing amount, customer's credit card number and others information to the Credit Card Processing Center (CCPC), step **2**. The CCPC captures the transaction data and authenticates the credit card. Then, the CCPC sends the transaction data to the Credit Card Company as shown in step **3**. The Credit Card Company checks to see if the purchasing amount is within the user's credit limit and other information than sends the authorization code to the CCPC, step **4** who in turns sends the authorization code to the Vendor, as shown in step **5** and that completes the user's purchasing transaction. The CCPC aggregates service charges for the credit card authentication services for each credit card company. When the service charge amount for a credit card company reached the thresholds as pre-determined between the CCPC and the Credit Card Company, the CCPC sends the invoice to the Credit Card Company as shown in step **6**. The Credit Card Company sends the invoice to the Vendor as pre-determined between the Vendor and the Credit Card Company for the cost of customer's purchases less services charges as shown in step **7**. The Credit Card Company sends invoice to the Customer

each month for the total purchases of goods or services made by the Customer during the month as shown in step **8**.

FIG. **2**(*b*) describes in more detail the transaction processing when the customer uses the User ID Barcode for the settlement of the purchases. The Customer purchases goods at a Vendor and the cashier captures product barcodes or the User ID Barcode, as shown in step **1**. The Vendor sends the transaction data including vendor ID, the product barcode or the User ID Barcode to the Vendor Server step **2**. The Vendor Server checks the barcode data it received from the Vendor to see if it is the User ID Barcode. If not, the barcode data represents the product, step **3** and the process goes back to Vendor, step **4**. If yes, the Vendor Server sends the transaction data including the User ID Barcode to the UVM Server, step **5**. The UVM Server checks to see if the Customer has enough fund or available credit limit in the user's UVM Account to cover the cost of the purchase. If yes, the UVM Server subtracts the cost of the purchase from the fund or available credit limit in the user's UVM Account and sends the approval signal to the Vendor through the Vendor Server, step **6**, and that completes the purchasing transaction. The UVM Server sends the invoice to the Vendor periodically as pre-determined between the UVM and the Vendor for the cost of the customer's purchase less service charges as shown in step **7**. Note that neither the CCPC nor any credit card company is involved in the purchasing transaction processing. The UVM is in fact the CCPC and a credit card company of its own in this case

Other methods rather than the User ID Barcode can be used to identify the user. One such alternative method is the use of cell phone with RFID tag or NIF chip. The cash register at the vendor site will have RFID tag or NIF chip reader to capture the user's identification number. Other means for the user identification such as driving license number or social security number may also be used for the present invention.

Referring now to FIG. **3**, the networked environment and apparatus of the present invention are described. The user cell phone loaded with the User ID Barcode or card printed with the User ID Barcode, 2 in 1 card **310** is used to make the purchase at the participating vendor. The barcode scanner **320** is used to capture the product's barcode the user is purchasing and the User ID Barcode. The transaction data including the vendor ID, the description of the products, the amount of the purchase and the User ID Barcode is sent to the UVM through the dedicated phone line **330** or the Internet **340** or the wireless phone connection **350**.

The transaction processing server computer, UVM **360** checks to see if the user's UVM account has enough funds or available credit limit to cover the cost of the product purchased. If so, the UVM subtracts the cost of the product from user's UVM account and sends the approval signal to the vendor cash register and that completes the purchasing transaction. If the user's UVM account does not have enough funds or available credit limit to cover the cost of the purchase, the transaction is canceled.

Referring now to FIG. **4**(*a*), the conventional credit card transaction processing server computer, CCPS, **400** as shown, and is described in greater detail. Web server **410** displays content or products that the vendor may sell on the web. Web server **410** may also display the list of participating vendors for users to make purchases offline. When a user makes an online purchase, the process goes through Web engine **420** to User Identifier **430**. The User Identifier **430** passes the transaction data including the vendor ID, the purchasing items descriptions, the cost of goods the user purchased, the total amount of the purchase and the user's credit card number to the conventional credit card processing program **440** within the CCPS **400**. Similarly, if the user makes the purchase offline at the participating vendor, the vendor cash register sends the transaction data including the vendor ID, the purchasing items descriptions, the cost of goods the user purchased, the total amount of the purchase and the user's credit card number to the conventional credit card processing program, **440** within the CCPS **440**. Note that the cost of the transaction processing by CCPS and the service charge for the purchasing transaction processing by the credit card company is expensive; therefore the purchasing amount using the conventional credit card usually is more than the micro payment thresholds, say $5.00. The user may pay for the purchase in cash or other means if the purchasing amount is less than say, $5.00 in micro payment level.

In case the vendor accepts the user's purchases even though the purchasing amount is within the micro payment level using the credit card or if the user makes the purchase at a participating vendor offline regardless of the amount of the purchase using the user's cell phone loaded with the User ID Barcode or 2 in 1 card which has the User ID Barcode printed in the back of the card, the user identifier **430** transfers the transaction data to the UVM server computer **450** as described in FIG. **4**(*b*).

FIG. **4**(*b*) describes the UVM server computer in greater detail. The user registers as a member and opens an account with the UVM. The UVM manages the user's account, processes the user's purchase transactions, adds funds to the user's account in the pre-paid mode or clears the user's available credit limit in the post pay mode, using the user's credit card or bank account as provided by the user at the time of the registration.

The UVM server computer **450** includes processor **480** which has the memory for the storage of User Database **485**, the User account number and the User transaction record **490**, the Product database **495** and the Vendor account record and the Vendor product sold record **496**. In a preferred embodiment, the UVM server computer **450** executes web server software **460**, web engine **470** and a computer interface software through which each purchasing transaction is processed and recorded. The UVM server computer **450** may execute database software, which stores information on the user's account, user's purchasing records, products user purchased, vendor information and settlement status the UVM has made with each vendor.

It will be understood by one skilled in the art that functions performed by the User Vendor Management Server computer UVM **450** may be performed by several computers. In a situation where the UVM server is handling a high volume of purchasing transactions, it may be necessary to distribute the tasks performed by User Vendor Management Server computer UVM **450** among several computers for performance reasons.

The processing of user's purchasing transaction as performed by the UVM server computer **450** is independent of any third party software, therefore there is no cost of processing for each transaction other than the initial cost of installing the UVM server computer **450**.

The transaction server computer **450** will have the feature allowing the user to set spending thresholds per purchase, per day, per week and per month so as to minimize the potential loss in case the user loses the cell phone downloaded with the User ID Barcode or credit card with the printed User ID Barcode or the user password is stolen. Furthermore, the transaction server computer **450** will send an e-mail containing the user transaction data, date and time that the transaction took place to the user for each transaction made allowing the user to confirm the purchase. The e-mail message may con-

tain a link for the user to lock the use's UVM account in case the user finds that there is an unauthorized use of the user's UVM account.

The transaction server computer **450** also maintains the algorithm for the User ID Barcode encryptions using the time variant method or user variant method or both.

FIGS. **5**(*a*) and **5**(*b*) describe the user registration process with the present method and system. In a preferred embodiment of the present invention, a user can register and establish an account over the network (online method) or using telephone, facsimile machine or e-mail. It should be noted that as used herein, the use of e-mail between the user's personal computer (PC) or the user's cell phone and the UVM operator of the present invention is considered as an offline method, since communications using e-mail is not a part of the business transaction between the user's client computer and the UVM server computer.

The registration and establishment of an account with the UVM operator, either using online method or offline method requires the user to provide the UVM operator the personal information including, name, User ID, Password, user address, cell phone number, facsimile machine number, e-mail address, etc. To properly and securely identify a user, the UVM operator may require additional private information from the user that may include the maiden name of the user's mother, the user's social security number and a password for use as a Personal Identification Number (PIN). As used herein, this personal private information is collectively called "other identifiers". These other identifiers are used from time to time to ensure proper identification of the user. The user may change his or her Password or PIN at any time if so desires. The UVM may obtain certain user's information from the cell phone companies or credit card companies in which the user's has an account. This automatic registration feature reduces the need for the user to provide detailed personal information and thus it is convenient to the user.

The system and method of the present invention allows the UVM operator to operate the system either as a pre-paid mode or as a post pay mode. The registration process starts with inquiry for either pre-paid mode or post pay system in **501**, as shown in FIG. **5**(*a*). For the pre-paid mode, the system describes the registration policy, the need to open the UVM account, the need to make the initial minimum amount of deposit in the UVM account as required by the UVM (Top Off amount) and other information, as in **502**. For the post pay mode, the system describes registration policy, the need to open an account, and the initial maximum available credit limit that is equivalent to the Negative Top Off amount and other information, as in **503**. In **504**, the system asks if the user wants to proceed. If not, the process exits as in **505**.

If the user wants to proceed, the system obtains the user personal information which includes name, address, phone number, e-mail address, User ID and Password, credit card or bank account information, user's cell phone number, Personal Identification Number (PIN), and other information as described in **506**. In **507**, the system agrees upon the user's payment method, either a credit card or the bank account or other methods. In **508**, the system decides if the payment method provided by the user is acceptable and if so, it proceeds to **512**. If not, the system asks the user for other payment method in **509**. In **510**, the system checks to see if the user wants to proceed. If yes, the process goes to **511** where the user provide other payment method and goes to **508** where the system repeats to check if the payment method provided by the user is acceptable. If the user does not want to proceed, the system proceeds to **535** and exits.

From **512**, the process goes to **513** where the system creates and assigns the user UVM account number that corresponds to the user's cell phone number or credit card number. In **514** the process informs the user the account number. The account number is inactive at this time.

In **515**, the process asks if the system is a pre-paid mode. If so, it sets in **516** the minimum amount of deposit (MT) that the user is required to deposit into the user's UVM account. This minimum amount of deposit MT is to be called as the Top Off amount. In **517**, the user made the initial minimum amount of deposit into the user's UVM account and the user's UVM account is than set as active. In **518**, the process adds the user to the database entry and set the user's available amount of funds AT equal to MT in **519**. In **520**, the system creates the User ID Barcode using user's cell phone number or credit card number and in **521**, the system sends to the user the card (or other media) printed with the User ID Barcode (the 2 in 1 new credit card) or download the User ID Barcode to the user's cell phone. In **522**, the system informs the user that the UVM account is active and it is ready for making purchases of goods either in micro payment level or non-micro payment level using the User ID Barcode. The user completes the registration process and exits in **535**.

If the system is to be operated as a post pay mode, the system sets the Credit Limit (CL) to be negative of the Top Off amount as indicated in **530**. The system then adds the user to the database entry in **531** and sets the user's available credit limit AC equal to CL in **532** than goes to **520** where the system creates the User ID Barcode and in **521**, the system sends to the user the card (or other media) printed with the User ID Barcode (the 2 in 1 new credit card) or download the User ID Barcode to the user's cell phone. In **522**, the system informs the user that the account is active and ready for making purchases of goods priced in either micro payment levels or non-micro payment level using the User ID Barcode. The user completes the registration process as indicated in **535**.

FIG. **6**(*a*) shows the user account balance after each purchasing transaction in a pre-paid mode. In initial stage #**1**, the user has the available amount of fund AT that is equal to Initial minimum amount of deposit MT (Top Off amount). In stage #**2**, the user made a purchase with the cost of goods CG and the cost of good CG is subtracted from the available amount of fund AT in the user's UVM account. Stage #**3** shows that the user made more purchases and the cost of good for the purchase is subtracted again, from the available amount of fund AT in the user's UVM account. In stage #**4**, the user's available amount of fund is not enough to cover the cost of good CG and the amount of fund that are short to make the purchase is AS. The system automatically Add Fund to the user's UVM account by charging the user's credit card (or the bank account whichever the user's payment method is registered) the amount NT that is AS, the amount short to make the purchase plus the Top Off amount MT. The resulting balance in the user's account after this purchasing and Add Fund processes is MT, the Top Off amount. This automatic add fund process using Top Off concept without requiring the user to enter the amount to be added to the user's account as described above is a very important feature of the present invention since it provides a very fast means for checkout at the vendor cashier.

FIG. **6**(*b*) shows the user account balance after each purchasing transaction in a post pay mode. In initial stage #**1**, the user has the available credit limit AC equals to the initial maximum credit limit allowed MT (Negative Top Off amount) when the use opens a UVM account. In stage #**2**, the user made a purchase with the cost of goods CG and the amount of the cost of good is subtracted from the user's

available credit limit AC for the user's UVM account. Stages #**3** shows that the user made more purchases and the cost of good CG for the purchase is subtracted again, from the available credit limit AC in the user's UVM account. In stage #**4**, the user's available credit limit AC is not enough to cover the cost of good CG and the amount of the credit limit exceeded is AS. The system automatically charges the user's credit card (or the bank account whichever the user's payment method is registered) the payment amount PA that is AS, the amount exceeded the available credit limit AC plus the initial maximum credit limit allowed MT. The resulting balance in the user's account after this purchasing transaction and the payment amount PA is zero and the user's available credit limit AC is restore to the initial maximum credit limit allowed MT. Again, this automatically charging the user's credit card (or bank account as provided by the user at the time of the registration) to clear the account balance to zero and restore the available credit limit AC to MT without requiring the user to enter the amount to be charged to the user's credit card (or bank account) as described above is a very important feature of the present invention since it provides a very fast means for checkout at the vendor cashier.

FIG. **7**(*a*) shows the purchasing process. The user goes to a store shown in **701** and select item or items to purchase as shown in **702**. The user makes payment to a store cashier in **703**. In **704**, the store cashier asks if the payment is to use the cell phone or credit card with the user ID Barcode. If not, the user makes the payment using other method at **708** that completes the transaction and exit at **709**. If the user is to use the User ID Barcode for the payment, the cashier captures the User ID Barcode in **705**. The User ID Barcode allows the process to access the user's UVM account in **706**. If the system is a prepaid mode, the process goes to **710** in FIG. **7**(*b*). If the system is a post pay mode, the process goes to **750** in FIG. **7**(*c*).

FIG. **7**(*b*) shows the purchasing process for the pre-paid mode. The process asks in **711** if the cost of good CG is less than or equal to the available fund AT in the user's UVM account. If yes, the cost of goods is subtracted from the available fund AT or AT=AT−CG in **712** and exit at **713**. If the cost of goods (CG) is greater than the available fund AT, than the process asks if the user wants to add more fund to the account at **714**. If not, the transaction is cancelled as shown in block **719** and the process exits at **720**.

If the user want to add more fund, the amount of shortage AS is computed AS=negative of (AT-CG) as shown in **715** and the amount of fund NT to be added will be the shortage amount AS plus the Top Off amount MT or NT=AS+MT as shown in **716**. The available amount of fund after the purchasing of the good and adding more fund in the user's UVM account will be AT=NT−AS=MT, the Top Off amount, as described in **717**. This completes the purchasing and adding fund transactions and the process exits at **718**.

FIG. **7**(*c*) shows the purchasing process for the post pay mode. The process asks in **751** if the cost of good is less than or equal to the available credit limit AC in the user's UVM account. If yes, the cost of goods is subtracted from the available credit limit AC or AC=AC−CG in **752** and exit at **753**. If the cost of good CG is greater than the available credit limit AC, than the process asks if the user wants to make the payment to clear the credit limit at **754**. If not, the transaction is cancelled in block **759** and the process exits at **760**.

If the user wants to make the payment to clear the credit limit, the amount of credit shortage (AS) is computed AS=negative of (AC-CG) as shown in **755**. The minimum amount of payment PA will be the amount of shortage AS plus initial maximum credit limit allowed which is the Negative



Top Off amount MT or PA=AS+MT as shown in **756**. The available credit limit after the purchasing of the good and the payment will be AC=PA−AS=MT, Negative Top Off amount as described in **757**. This completes the purchasing and the payment transactions and the process exits at **758**.

FIG. **8** is a diagram showing the purchasing process when User**1** registered at UVM**1** makes a purchase at a vendor belonging to another UVM operator UVM**2**. In step (**1**), the vendor cashier captures the user's User ID Barcode for the purchases the user made. In step (**2**), the transaction goes to UVM**2** for authentication. UVM**2** found that the User**1** is not a user registered at UVM**2** and requests the BRIDGE in step (**3**) to authenticate the user from other UVM operator, UVM**1** in the example shown. BRIDGE inquires UVM**1** in step (**4**) to see if User**1** has registered with UVM**1** and if so, to see if the User**1**'s account has enough fund to cover the cost of good. If yes, the cost of good is subtracted from the available fund or available credit limit in the User**1**'s account in step (**5**). In step (**6**), the process responds to BRIDGE that the purchasing transaction is approved and in step (**7**), BRDGE informs UVM**2** the approval for the transaction. In step (**8**), UVM**2** sends the approval signal to the cash register at the vendor site and that completes the transaction in step (**9**).

BRIDGE settles with each UVM operators under its control when the amount or time reaches the thresholds previously agreed upon among all UVM operators. UVM**1** may receive a certain commission from UVM**2** because User**1** registered at UVM**1** made a purchase at a vendor of UVM**2**. In addition, UVM**1** and UVM**2** may pay BRIDGE for its service. This service fee is called Toll Charges similar to highway toll. UVM**1** settles with the vendor when it reaches previously agreed thresholds either by the amount or time.

FIG. **9** is an example of the logic when a user makes purchases at a vendor of a different currency for international transaction. User**1** registered at UVM (A) of country A makes a purchase at a Vendor of UVM (B) of country B in step (**1**). The vendor tried to obtain the approval for the sale from its UVM (B) in step (**2**). UVM (B) found that User**1** is not a registered user and inquire for approval of the purchase from its BRIDGE (B) in step (**3**). BRIDGE (B) found that User**1** is not a member of any of its UVM in their country B and request SUPPER BRIDGE in step (**4**) to locate User**1** for potential international transaction.

In step (**5**), SUPPER BRIDGE inquires BRIDGE (A) of country A and BRIDGE (A) found that User**1** is a registered user of its UVM (A) in step (**6**). UVM (A) subtracts the cost of good from the available fund, AT of User**1**'s account (prepaid mode) or User**1**'s Available Credit limit AC (post pay mode) in step (**7**). UVM (A) notifies BRIDGE (A) of its approval for the transaction in step (**8**). BRIDGE (A) in turn notifies SUPPER BRIDGE for the approval of the transaction in step (**9**). SUPPER BRIDGE notifies BRIDGE (B) for the approval of the transaction in step (**10**). In step (**11**), BRIDGE (B) notifies UVM (B) of the approval of the transaction and in step (**12**), UVM (B) send the approval signal to the Vendor cash register and step **13** completes the international purchasing transaction.

In the above transaction, BRIDGE (A) may receive certain commission from BRIDGE (B) since User**1** is a member of UVM (A) who is under BRIDGE (A) made the purchase from a Vendor under UVM (B) who is under BRIDGE (B). BRIDGE (A) and BRIDGE (B) may pay certain fee to SUPER BRIDGE similar to UVM paying BRIDGE for its service as described in FIG. **8** above.

In the above international transaction, it should be noted that there exists exchange rate between two countries. The cost of the good User**1** purchased in the country B needs

adjustment taking into consideration of the exchange rate between the country B and country A where the payment for the cost of the good is to be made from User**1**'s account, in step (**8**).

SUPPER BRIDGE, BRIDGE (A) and BRIDGE (B) need to keep the record of each transaction involving exchange rate adjustment. Alternatively, it may be desirable that User**1** creates an account with UVM (B) if transactions with UVM (B) are to be taken placed frequently. In that case, with the approval from User**1**, UVM (B) may request UVM (A) for transferring of a copy of User**1**'s personal information so that UVM (B) may create a User**1** account within UVM (B). The User**1** may use the same payment method as registered with UVM (A) or use a different payment method, such as a different credit card for the UVM (B). SUPPER BRIDGE, BRIDGE (A), BRIDGE (B), UVM (A), UVM (B) may be entitled to service fee to be decided among all parties concerned for completing the user purchase transaction.

While preferred illustrative embodiments of the present invention are described above, it will be evident to one skilled in the art that various changes and modifications may be made without departing from the invention. For example, gift certificate of certain amount of fund may be given away in contests or as incentives in addition to awarding some amount of fund in the user's account proportional to the amount of purchases similar to each credit card company normally awards points to the owner of the credit card, or different forms of online and offline payment may be accepted at the option of the UVM operators and vendors.

What is claimed:

**1**. A method for conducting offline electronic commerce transactions having a vendor barcode scanner and a vendor cash register comprising:

(a) providing a personal code to a person for their use to purchase goods;

(b) converting said personal code into barcode format to form a User ID Barcode, said User ID Barcode corresponding to said personal code and including at least one special character to distinguish the barcode as a User ID Barcode from a product barcode;

(c) storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor;

(d) establishing a User Account in a User Vendor Management Server corresponding to said personal code;

(e) depositing funds in said User Account to establish a credit limit;

(f) conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server;

(g) detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server;

(h) comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server;

(i) forwarding the approval signal to the vendor cash register; and

(i) repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode.

**2**. The method of claim **1** wherein said User ID Barcode is stored by said person in a cell phone.

**3**. The method of claim **1** wherein said User ID Barcode is stored by said person on a label secured to a credit card or secured to a user's cell phone.

* * * * *